**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

FEDERAL TRADE COMMISSION;

STATE OF ALABAMA;

STATE OF ARKANSAS, *ex rel.* Attorney General Tim Griffin;

COLORADO ATTORNEY GENERAL;

OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS;

PEOPLE OF THE STATE OF ILLINOIS;

STATE OF IOWA, *ex rel.* Brenna Bird, Attorney General;

STATE OF KANSAS, *ex rel.* Kris W. Kobach, Attorney General;

STATE OF LOUISIANA;

STATE OF MISSISSIPPI;

STATE OF NEBRASKA, *ex rel.* Michael T. Hilgers, Attorney General;

STATE OF OHIO, *ex rel*. Attorney General D. Andrew Wilson;

STATE OF OKLAHOMA;

COMMONWEALTH OF PENNSYLVANIA by Attorney General David W. Sunday Jr.;

STATE OF SOUTH CAROLINA, *ex rel.* Alan Wilson, in his official capacity as Attorney General of the State of South Carolina;

STATE OF TENNESSEE, *ex rel*. Jonathan Skrmetti, Attorney General and Reporter;

Case No. 2:26-cv-1267

**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTIES, AND OTHER RELIEF**

UTAH DIVISION OF CONSUMER PROTECTION; AND

STATE OF WISCONSIN,

Plaintiffs,

v.

FAMILY DOLLAR STORES, LLC, also d/b/a Family Dollar, a limited liability company,

Defendant.

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission"); Alabama, Arkansas, the Colorado Attorney General, Florida, Iowa, the People of the State of Illinois, Kansas, Louisiana, Mississippi, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, and the Commonwealth of Pennsylvania, by and through their respective Attorneys General (collectively, "Attorneys General"); the Utah Division of Consumer Protection; and the State of Wisconsin acting by and through the Wisconsin Department of Justice (together with the Attorneys General and the Utah Division of Consumer Protection, "Plaintiff States," and collectively with the FTC, "Plaintiffs"), for their Complaint, allege:

1. The FTC brings this action for Defendant's violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801-6809, 6821-6827 ("GLB Act"). For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, and pursuant to Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a).

2. The Plaintiff States allege that Defendant's false or misleading claims discussed below constitute unlawful, unfair and/or deceptive acts and practices that are prohibited by the

below enumerated state consumer protection laws.

## SUMMARY OF THE CASE

3. Family Dollar Stores, LLC ("Family Dollar" or "Defendant") promotes itself as a national retailer dedicated to providing "affordable products and trusted values to families across America." However, this promise is undermined by Family Dollar's deceptive pricing practices. For years, Family Dollar has charged consumers more at the register than the prices it advertises—betraying the trust of millions of American consumers who rely on Family Dollar for essential household goods and necessities and imposing significant financial harm on the communities that can least afford it.

4. Family Dollar operates more than 7,000 stores nationwide, and for many of its customers, shopping at Family Dollar is unavoidable. Its locations are concentrated in low-income urban and rural communities, including areas Family Dollar itself describes as "food deserts," where residents have little access to full-service grocery stores. For many families in these neighborhoods, Family Dollar stands as one of the only accessible sources for basic household necessities.

5. Most products sold by Family Dollar are priced at $5 or less, and with the average Family Dollar shopping basket totaling just $16, many consumers are carefully stretching every dollar they have to cover basic needs. Yet Family Dollar routinely charges more at checkout than the prices displayed on its shelves, in its weekly circulars, and on its website and mobile app—including for essential household products, such as milk, eggs, and diapers. For consumers living paycheck-to-paycheck, even a slight price increase at checkout can lead to real, adverse consequences. Despite serving consumers for whom affordability and accuracy are critical, Family Dollar has repeatedly charged higher prices at the register. This pattern is documented

across numerous state audits, consumer complaints, and FTC undercover purchases.

6. Family Dollar knows that it harms consumers by persistently charging prices at the register that are higher than those it advertises. The scope of Family Dollar's unlawful pricing conduct is extensive. Consumers from across the country have consistently reported widespread and ongoing pricing discrepancies, and regulatory inspections have confirmed that price labels are inaccurate in stores across the nation, with Family Dollar frequently charging higher prices at the register. Since 2022, federal, state, and local regulators have cited Family Dollar for thousands of pricing violations, resulting in fines exceeding $3 million. And since 2024, Family Dollar has entered into multiple settlements with state Attorneys General, paying over $800,000 in penalties for inaccurate pricing.

7. Despite widespread consumer complaints and increasing regulatory scrutiny, Family Dollar has failed to implement adequate safeguards to prevent continued overcharging. Its pricing systems—particularly its practice of automatically updating prices at the point of sale ("POS") without ensuring shelf labels are updated—virtually guarantee ongoing price discrepancies. Even now, Family Dollar continues to overcharge customers.

8. As a direct result of Family Dollar's unlawful conduct, consumers nationwide have paid significantly more than expected for basic household goods and necessities. The consequences of these overcharges fall most heavily on shoppers living on razor-thin margins—families who carefully budget every dollar and rely on accurate, transparent pricing simply to meet their day-to-day needs. Family Dollar has failed to implement safeguards to prevent pricing overcharges, shifting the cost of its operational shortcomings onto consumers. Since January 1, 2023, the company has collected millions of dollars in unlawful overcharges.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345. This Court also has subject matter jurisdiction over the supplemental state law claims asserted by the Plaintiff States under 28 U.S.C. § 1367.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFFS

11. The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces Section 521(a) of the GLB Act, 15 U.S.C. § 6821(a)(2), which prohibits "making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution" "to obtain or attempt to obtain, or cause to be disclosed or attempt to cause to be disclosed to any person, customer information of a financial institution."

12. The State of Alabama is the enforcing authority under the Alabama Deceptive Trade Practices Act ("DTPA") pursuant to § 8-19-8(a) of the Code of Alabama and is authorized to pursue this action to enjoin violations of the Alabama DTPA and to obtain legal, equitable or other appropriate relief, including rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, civil penalties, or other relief as available under the Act.

13. The State of Arkansas is authorized to bring this action pursuant to the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq.*, in order to obtain injunctive

relief and monetary remedies, including consumer restitution and civil penalties of up to $10,000 per violation.

14. The Colorado Attorney General is authorized to bring this action pursuant to Colo. Rev. Stat. § 6-1-101 *et seq.* ("CCPA"), to obtain injunctive relief, civil penalties, and restitution for conduct declared unlawful under the CCPA.

15. The Office of the Attorney General James Uthmeier, State of Florida, Department of Legal Affairs ("Florida Attorney General"), is authorized to bring this action as the enforcing authority of the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes ("FDUTPA"), to obtain temporary, preliminary, and permanent injunctive relief, equitable monetary relief, consumer restitution, the refund of monies paid, disgorgement of ill-gotten monies, attorney's fees, civil penalties, and other relief pursuant to Sections 501.207(1)(b), 501.207(3), 501.2075, and 501.2077, Florida Statutes. The Florida Attorney General has reviewed the matters alleged herein and determined that this enforcement action serves the public interest. FDUTPA prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce. Conduct that violates Section 5(a) of the FTC Act also violates FDUTPA. § 501.204(2), Fla. Stat.

16. The People of the State of Illinois, as part of the same case or controversy, also bring this action pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act ("ILCFA"), 815 ILCS 505/1 *et seq.*, and the Illinois Deceptive Trade Practices Act ("IDTPA"), 815 ILCS 505/1 *et seq*. The Attorney General of the State of Illinois brings this action under Section 7 of the ILCFA to obtain a permanent injunction, restitution, and civil penalties against Defendant.

17. The State of Iowa is a sovereign state and brings this action for Defendant's

violations of The Iowa Consumer Fraud Act, Iowa Code § 714.16, and seeks injunctive relief, reimbursement, disgorgement of revenues related to Defendant's unlawful conduct, civil penalties, and costs and attorneys' fees. Section 7 of the Iowa Consumer Fraud Act expressly authorizes Brenna Bird, as Attorney General of the State of Iowa, to bring this action.

18. The State of Kansas, by and through its Attorney General, Kris W. Kobach, is authorized to bring this action pursuant to the Kansas Consumer Protection Act ("KCPA"), K.S.A. 50-623, *et seq.*, to obtain orders, judgments, and injunctive relief as may be necessary to prevent the use or employment by a supplier of any practices declared to be a violation of the KCPA and to obtain monetary relief, including reasonable expenses, investigation fees, restitution for consumers, civil penalties, and other equitable relief.

19. The Attorney General of the State of Louisiana brings action in the public interest of the State of Louisiana to seek permanent injunctive relief, restitution, and civil penalties against Family Dollar pursuant to the Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401, *et seq.* ("LUTPA"), and the Louisiana False Advertising Law, La. R.S.51:411, *et seq*. The Attorney General has the constitutional and statutory authority to bring this action on behalf of the public pursuant to LUTPA.

20. The State of Mississippi, by and through Attorney General Lynn Fitch, is authorized to bring this action pursuant to the authority granted by Miss. Code Ann. § 7-5-1 *et seq*. and Miss. Code Ann. § 75-24-1, *et seq*., upon the ground that Defendant has engaged in unfair or deceptive acts and practices in or affecting commerce as declared unlawful by the Mississippi Consumer Protection Act at Miss. Code Ann. § 75-24-1, *et seq*., and to obtain injunctive relief, civil penalties, restitution, and any and all other remedies provided by law.

21. The State of Nebraska is a sovereign state. Michael T. Hilgers, as Attorney

General of the State of Nebraska, is expressly authorized to bring this action under Nebraska's Uniform Deceptive Trade Practices Act on behalf of the State of Nebraska to protect the state and its residents from Defendant's unlawful business practices. Neb. Rev. Stat. § 87-303.05(1) and Neb. Rev. Stat. § 87-303.11(1).

22. The State of Ohio, by and through Ohio Attorney General, D. Andrew Wilson, having reasonable cause to believe that violations of Ohio's consumer laws have occurred, brings this action in the public interest and on behalf of the State of Ohio under the authority vested in him pursuant to O.R.C. 1345.07 of the Ohio Consumer Sales Practices Act ("Ohio CSPA"). The Ohio Attorney General brings this enforcement action to, among other things, obtain injunctive relief, declaratory relief, restitution, and civil penalties for Defendant's acts or practices in violation of the Ohio CSPA.

23. The State of Oklahoma, Office of the Oklahoma Attorney General, by Attorney General Gentner Drummond, is the chief legal officer of the State of Oklahoma and brings this action in the name and on behalf of the people of the State of Oklahoma to protect the state, its general economy, and its residents from Family Dollar's unlawful business practices. 74 O.S. § 18b(A). The Attorney General has authority under the Oklahoma Consumer Protection Act, 15 O.S. 751 *et seq.*, to bring this action and seek injunctive relief, civil penalties, disgorgement, restitution, and other equitable relief, as well as attorneys' fees, expenses, and costs.

24. The Commonwealth of Pennsylvania, Office of Attorney General, by Attorney General David W. Sunday Jr., ("PA OAG" or the "Pennsylvania Office of Attorney General") is the chief legal officer of the Commonwealth of Pennsylvania. 71 P.S. § 732-206(a). The Pennsylvania Office of Attorney General brings this action pursuant to the *Pennsylvania Unfair Trade Practices and Consumer Protection Law*, 73 P.S. § 201-1 *et seq.* ("*PA Consumer*

*Protection Law*") which authorizes it to obtain injunctive relief, civil penalties, restitution, costs, and other equitable relief whenever he has reason to believe a person is using or is about to use any method, act or practice declared to be unlawful under section 201-3 of the act and that the proceedings would be in the public interest. 73 P.S. § 201-4; § 201-4.1; § 201-8(b). Section 3 of the *PA Consumer Protection Law* declares as unlawful unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of Section 201-2(4) of the *PA Consumer Protection Law*. 73 P.S. § 201-3.

25. The State of South Carolina brings this action, by and through its Attorney General, Alan Wilson, in its sovereign capacity in order to protect the interests of the State and its citizens. The Attorney General brings this action pursuant to his *parens patriae*, constitutional, statutory, and common law authority, including the authority granted to him by the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-20, 50, and 110.

26. The State of Tennessee is authorized through Attorney General and Reporter Jonathan Skrmetti, as the chief legal officer of the State, to bring this action pursuant to the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq.*, to obtain injunctive relief and monetary remedies on behalf of Tennessee and its consumers, including civil penalties, attorneys' fees and costs, and consumer restitution.

27. The Utah Division of Consumer Protection is a state agency within the Utah Department of Commerce. Utah Code § 13-2-102. The Utah Division of Consumer Protection enforces Utah's consumer protection laws, including the Utah Consumer Sales Practices Act ("Utah CSPA") and administrative rules enacted pursuant thereto, which prohibit deceptive acts and practices in connection with consumer transactions. Utah Code §§ 13-2-102(2), 13-11-4, -9, -17; *see also* Utah Admin. Code R152-11-201. Under the Utah CSPA, the Utah Division of

Consumer Protection is authorized to bring this action to obtain injunctive relief, monetary remedies, including disgorgement and actual damages, and fines. Utah Code § 13-11-17(1).

28. The State of Wisconsin is represented in this action by the Wisconsin Department of Justice, which is vested with the authority to enforce the Wisconsin Deceptive Trade Practices Act. Wis. Stat. § 100.18(11)(d). The State of Wisconsin brings this enforcement action to obtain injunctive relief, restitution, civil forfeitures, consumer protection surcharges, supplemental forfeitures, and attorneys' fees, expenses, and costs. Wis. Stat. §§ 100.18(11)(d), 100.26(4), 100.261, 100.263, and 100.264.

## DEFENDANT

29. Defendant Family Dollar is a Virginia limited liability company with its principal place of business at 510 Volvo Parkway, Chesapeake, Virginia 23320. Family Dollar transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Family Dollar has advertised, marketed, distributed, or sold general merchandise on a retail basis to consumers throughout the United States.

## COMMERCE

30. At all times relevant to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS ACTIVITIES

### Overview of Family Dollar

31. Family Dollar was founded in Charlotte, North Carolina in 1959. As of August 2026, Family Dollar has 7,076 stores located across 48 states and Washington, D.C.

32. Family Dollar is a private company.

33. Family Dollar primarily serves lower-than-average-income customers in urban and rural locations.

34. Family Dollar stores are often located in what it calls "food deserts," which it describes as areas "where other stores choose not to locate, providing a convenient, close-to-home option where customers can shop for essentials."

35. Family Dollar sells a variety of consumer goods at low prices, including food, cleaning and laundry supplies, seasonal items, and more. Approximately 80% of the products sold by Family Dollar are consumables—food, cleaning supplies, and household staples.

36. After seeing false prices, consumers go to check out at the in-store registers, where Family Dollar asks for and frequently obtains consumers' payment information, namely information from their credit and debit cards and checks that contain the consumers' bank account information, through means including attempted credit or debit card transactions that fail for a reason other than a card decline, such as a point of sale equipment malfunction or physical problem with the card.

37. Family Dollar reported approximately $13 billion in revenue in 2025.

**<u>Family Dollar's False Representations Regarding Pricing</u>**

38. Family Dollar advertises its products outside of stores through, for example, printed circulars, the Family Dollar website, and the Family Dollar mobile application ("app"). Family Dollar also advertises or otherwise makes representations regarding its prices through price labels and signage in store locations. In numerous instances, Family Dollar's advertisements, labels, and signage have falsely stated the price that consumers will be charged for products.

*Circulars*

39. Family Dollar's printed circulars depict products that are available for sale to consumers at specified prices. An example page from a circular posted on the company's website in January 2026 is depicted below as Figure 1.




**Figure 1**

40. However, on numerous occasions, Family Dollar has refused to honor the prices advertised in circulars, instead charging higher prices at the register.

41. In January 2025, consumers from at least seven states reported that Family Dollar refused to honor a "2 for $20" sale for packages of diapers, despite the price being advertised on the company's weekly flyer (including on the mobile app) and on shelf tags. As described by a Michigan consumer, "There was an advertisement posted in the app for the weekly flyer stating that Large packs of diapers were on sale for 2 for $20 on 1/20/25. I took a picture of the shelf tag to share, and went to the checkout before closing. The manager told me that the price was wrong and he would not sell to me at that price. I showed him the advertise[ment] which was consistent with [w]hat was on the shelf. He quickly removed the shelf tags, and told me that the price will not be honored." Several consumers provided photos of the "2 for $20" advertisement in Family Dollar's mobile app, as shown in Figure 2, and on Family Dollar's store shelves, as shown in Figure 3.


5:31
5G
Current Ad
Huggies Wipes
56 ct.
25¢ OFF
with
Smart Coupon†
HUGGIES
2/$20*
*MFR Offer
Sale!
Pampers Baby
Dry or Swaddlers
Diapers Sizes
NB-6, 64-96 ct.
or Easy Ups Sizes
3T-6T, 56-66 ct.
Must buy 2.
easy ups
2/$23
with
Smart Coupon†
Poise Pads 22-66 ct. or
Depend Underwear
Sizes S-XL, 15-19 ct.
Sale! 2/$28
SC $5
MAXIMUM ABSORBENCY
Poise
PADS
FOR BLADDER LEAKS
33 PADS
ABSORBS
25x
ITS WEIGHT
Clearblue
Sensodyne or
Home
Explore
Coupons
Account
More

**Figure 2**




**Figure 3**

42. In July 2023, a consumer in Columbus, Ohio reported to the Better Business Bureau: "I want to file a complaint against Family [Dollar] for false advertisement. I saw in my Sunday's paper where you buy 1 cereal and get one for 1 dollar. . . . I paid for one and did not get that second one for 1 dollar. I talked [to] the cashier and she did not honor it. She said she

was not aware of such a sale." The consumer enclosed with her complaint the relevant advertisement as well as her receipt showing the overcharge, which are shown below as Figures 4 and 5 (with the consumer's personal information redacted).




**Figure 4**



FAMILY DOLLAR
STORE #03980 2175 EAKIN RD
COLUMBUS,OH, 614-591-6914
KELLOGGS FROSTED FLAKES 10.9 OZ p3.65
038000199042
REGULAR PRICE 3.75
KELLOGGS FROSTED FLAKES 10.9 OZ p3.65
038000199042
REGULAR PRICE 3.75
HI. CLEANING BLEACH LEMON 121FLOZ 6.50 T
032251719073
SUBTOTAL $13.80
TAX1 $0.49
TOTAL $14.29
VISA $14.29
[redacted]
ITEMS 3
07-17-2023 12:32:59 03980 01 7488768 7123
Cash Check Debit Credit & EBT Accepted.
THANK YOU.

I did Not get 1 Box For 1.00

**Figure 5**

***Website & Mobile App Advertisements***

43. Family Dollar also advertises product prices through electronic platforms, including the Family Dollar website and mobile application. Many advertisements on Family Dollar's website and app show products that are available in-store for sale to consumers at specified prices. *See, e.g.*, Figure 6. Family Dollar's mobile app also contains coupons, called "Smart Coupons," that advertise discounted prices for specified products. In order to purchase items for the price advertised on a Smart Coupon, customers shopping in stores are required to log in to the Family Dollar mobile app and show the applicable coupons to the cashier while checking out at the register.




**Figure 6**

44. However, in numerous instances, Family Dollar charges more at the register than the prices listed on its website and mobile app.

45. Consumers frequently report that they do not receive the discounted prices shown on Family Dollar's Smart Coupons, because the mobile application does not work and prevents customers from accessing and redeeming the coupons at the register. For example, Family Dollar's February 2026 report compiling common themes in customer complaints on social media platforms noted "issues with coupons remain[] a primary concern for shoppers at Family Dollar, with complaints mentioning coupons not loading, attaching, or working at the register. Frustrations were further fueled by . . . missed offers due to staff not honoring promotions."

46. Family Dollar's review of complaints submitted in December 2025 and January 2026 regarding the company's mobile app showed that almost 19% of the complaints involved "prices/coupons." For example, one consumer reported: "Even their cashiers will tell you the app never works. . . . All the coupons I clipped in the app today would've saved me $12 but since they failed I couldn't afford my things and left empty handed."

47. An additional 48.5% of the complaints stated that the app often malfunctions, which prevented many consumers from using the electronic coupons while checking out in the store. As one consumer put it, "Seems like they're betting on people getting to the register, the coupon not working, and people just paying full price."

48. Examples of these complaints submitted to Family Dollar in December 2025 and January 2026 include:

A. "The app won't let you clip the coupons anymore so I can't even use my coupons."

B. "The app has always been helpful for managing coupons and helping me save a few bucks when I can. Seems like the app doesn't allow you to clip coupons digitally, you click to clip and it spins and spins and eventually times out. How useless!"

C. "Total scam. The $10 off $25 purchase coupons never . . . work."

D. "The Family Dollar app is extremely unreliable. Coupons frequently don't apply at checkout—even though they're clipped—and it seems to work for some people but not others. The app crashes a lot, loads slowly, and constantly throws server errors. It's frustrating to waste time clipping coupons only to find out the discounts won't work."

E. "I click the clip tab and it looks like it's clipped but never records to the amount. After half an hour of trying, it seems like the offer of coupons is just a scam to get you into the store, where you won't actually get any discounts because the coupons you've clipped aren't on your account."

F. "[A]pp shows the price with the coupon already deducted which is very confusing and misleading."

49. Family Dollar's internal records show that consumers have complained to the

company since at least 2020 about the same problems with the mobile app failing to provide the promised discounts or prices. Examples of 2020 complaints include:

A. "I didn't receive 3 of my coupons and manager would not apply even though they were on my app. that was a total of $14 that I needed to save. [A]nd I say needed because times are hard right now, and I'm trying to save every dollar I can, and to be treated like this and not honor coupons was very hurtful and upsetting."

B. "Not all your stores participate in your coupons and the app don't work."

C. "The app won't let me get or view coupons or get Saturday's $ 5 discount !!!"

D. "I had clipped several on line coupons from the Family Dollar app my total was over $50. After putting in my phone number it only took 1 coupon. I showed her my coupons clipped and it would not take off the $5 off the total. I asked for the manager to help and she said, 'I cant do anything. If the register won't take it then I cant do it.'"

50. Likewise, consumers file complaints with state and federal regulators and consumer protection organizations, including the Better Business Bureau, regarding Family Dollar charging more at the register than it advertised on its website or mobile app. Below are examples of these complaints:

A. In February 2026, a consumer in Gainesville, Florida complained "Family dollar is advertising fake sale prices on their website. They will not honor the sale price on their website or their app."

B. In July 2025, an Arizona consumer complained "I am writing to express my concern regarding a recurring issue with pricing discrepancies between the app and in-store purchases. On multiple occasions, the price displayed in the app has not been honored at the register, despite being clearly advertised. This has resulted in wasted time, unnecessary travel, and additional expense, as I visited the store expecting to pay the price shown in the app. I find this practice misleading and deceptive[.]"

C. In November 2025, a New York consumer complained that "Family Dollar advertised low prices for cleaning supplies on their website and app. This prompted me to got [sic] to their store over their competition. I purchased my items under the impression they were one price just to go to be charged a completely higher price, which I didn't see until I went through my receipts nine hours later. . . . I spoke with the manager, a young lady, explaining my

situation and she cut me off consistently to the point [where] I had to over talk her. She was very argumentative . . . and knew exactly what I was talking about with the pricing discrepancy. She quoted a New York state law saying that they couldn't make any price adjustments, even though she knew the prices being charged were not the prices advertised in the store, the website, or the app. . . . She said the prices were being changed but they only did half the store. However, the prices WERE changed in the system. . . . This was my last few dollars I, personally, had to my name."

D. In November 2025, another consumer complained, "Family Dollar in the Baltimore[,] Maryland region has deceptive pricing. I went to approximately four or five different stores because their weekly ad beginning November 16th 2025 said that the Gain fabric softeners were three for $10, after you clipped the coupon in the app. Every store that I went to the price was well over $10.60. . . . I went to the Family Dollar located on Gwen's Falls [P]arkway, Frederick [R]oad, [R]olling [R]oad, [S]ecurity [B]oulevard, and every store had a different price, and no one honored the three for 10 pricing."

E. In November 2024, a consumer complained, "When I was at the Family Dollar in Griffin, GA, the digital coupons did not work in taking off during the sale of purchase at the cash register. I showed the manager on duty that the coupons were clipped, and her response was 'it is a corporate problem'. I responded that this is unacceptable, it is a bait and switch to lure customers in . . . ."

F. In August 2024, a consumer complained, "FALSE ADVERTISING OF COUPONS ON THE FAMILY DOLLAR APP. WENT TO SAN PEDRO, CA STORE TO USE COUPON FOR $1.00 OFF AND ANOTHER ONE. NEITHER OF THEM WORKS. . . . STORE MANAGEMENT CANNOT OVERRIDE DUE TO ORDERS FROM UPPER MANAGEMENT NOT TO HONOR IT!! ITS LIKE SAYING 'SORRY, YOU CANNOT USE COUPONS, YOU HAVE TO PAY FULL PRICE!!' WHAT'S THE USE OF ADVERTISING COUPONS IF THEY CANNOT HONOR IT?? FALSE ADVERTISEMENT!!"

51. As described above and below, in many instances, Family Dollar falsely represented its prices in advertisements, including on price tags, and instead sold the products for more than advertised.

### *In-Store Pricing*

52. Family Dollar also advertises its products' prices in stores. In its stores, Family Dollar advertises products available for sale to consumers at specified prices, whether through

promotional signage, prices on the shelves, prices on the products themselves, or signage relating to special offers (such as a "buy-one-get-one" deal or "clearance" prices). Examples are depicted below as Figure 7, Figure 8, and Figure 9:




**Figure 7**


SKUs: assorted
361
COOKIES_CRACKERS
FLASH DEALS
4-DAY SALE!
Chips Ahoy! and
Oreo Cookies
13.37-19.5 oz
Must buy 2 to receive discount
$.128 - .187 per oz
2/$5
put up: 1/16 take down: 1/19/2026
NO MIX
MUST BE 2 the same
OREO
DOUBLE STUF
CHOCOLATE SANDWICH COOKIES
FAMILY SIZE
Spend $9
Save $2

**Figure 8**




**Figure 9**

53. However, on numerous occasions, Family Dollar charges more than the price listed on the shelf, the product, or in the in-store sales offer.

54. Consumers have complained about false pricing to Family Dollar directly and to state and federal regulators and consumer protection organizations.

55. A January 2023 presentation for Family Dollar Regional Directors summarized multiple complaints received from customers that Family Dollar was not charging the advertised

price. Examples of the complaints quoted in this presentation include:

A. "STORE PRICING LABELS DON'T MATCH PRICING THAT REGISTER RINGS UP AND THE STORE MANAGER ROBIN WOULD NOT HONOR THE PRICE THAT WAS LISTED ON THE SHELF TAG. FAMILY DOLLAR IS FALSE ADVERTISING. THERE WAS A 75 CENT DIFFERENCE BETWEEN THE TAG PRICE AND REGISTER PRICE."

B. "This family dollar store has failed to correct a pricing problem. I check my receipts. They have a 4 for 4 Dollars sign posted for hot pockets, but they ring up 1.25 each. Although I reported this twice and received a refund they did not resolve the problem for any future customers that don't check their receipts. This is fraud upon your customers due to the failure to address the issue."

C. "I think it's wrong that you don't honer [sic] pricing when you call the manager up front and show them where you got something . . . saying 6.00 and charge me 10.00 and won't honor shelf price."

D. "Several items I planned to purchase were a different price from what was displayed . . . . The manager Robin refused to honor the advertised price and did not check the products location to confirm pricing on the shelf."

E. "Rude to customers and uncooperative toward pricing. Every item [I] purchased was mislabeled in pricing on the shelves. Instead of apologizing or verifying the store mistake I was told if I don't want them I can have a refund. I was not thanked or told good day after complaining that every item rang higher than the shelf pricing. I was charged almost $10 more than what I expected."

F. "The register pricing do not match merchandise prices on the sales floor. After the discrepancy was brought to the sales associate's attention she refused to adjust the register price. Even though the merchandise prices were clearly mark[ed] on the floor. The associate pointed to a hand written note not adjusting prices."

56. Family Dollar's internal reviews of complaints posted on social media platforms repeatedly highlight patterns of complaints regarding inaccurate prices. For example, in July 2025, a social media review identified themes of complaints regarding "mismatches between shelf price, app, and checkout pricing." In August 2025, the company's social media report again noted repeated "[c]ustomer concerns centered on . . . pricing and promotion distrust (shelf vs.

register mismatches, clearance not honored, missing offers).” In May 2026, the company’s social media report once again noted that “pricing issues caused further customer friction, with users complaining about inconsistent pricing and cashiers refusing to manually adjust prices as advertised.”

57. The FTC, state regulators, and consumer protection organizations, including the Better Business Bureau, also receive complaints about false shelf pricing at Family Dollar. Below are examples of such complaints:

A. In May 2026, a Pennsylvania consumer complained, “The shelf price tag of a half-gallon of milk indicated $3.55. The cashier charged me $4.15. I paid (cash), then double checked the tag. I approached the cashier to ask why I was charged $4.15 rather than $3.55. She looked at my receipt and then rescanned the milk. She said, ‘All I can figure out is that there must have been a price increase, but the tag wasn't changed yet.’ I informed her that she was required to sell me the milk at the price it was marked, and that Dollar General recently settled a lawsuit regarding this exact thing. She refused to do that, so I returned the milk for the full amount that I paid.”

B. In December 2025, an Ohio consumer complained, “On December 4th 2025 at approximately 8:45 a.m. I visited a local family Dollar that is located off of Wooster Road in [B]arberton Ohio 44203. I s[aw] and scanned the Energizer 16 pack AA batteries in store with the [F]amily Dollar app and it showed a sale price of $11.50. [W]hen checking out the batteries that I previously scanned at sale price rang up for $13.50[.] I then asked the manager why it rang up at more of a price than what it’s showing in the [F]amily Dollar app she then proceeds to tell me that she cannot validate that price even though I scanned the product in store with a [F]amily Dollar app . . . Why have a sale price if you’re not going to give the sale price to a customer? She was very rude[.]”

C. In December 2025, a Wisconsin consumer complained, “I purchased a 2026 Calendar today December 4, 2025. The price of $1.50 was clearly marked on the bottom of the calendar in a red circle for $1.50. When I went to the register to pay for it, it rang up as $2.00. I told the cashier Alex that he has rung up the wrong price. . . . [W]hen the manager Riyder rang it up he said that the price is $2.00. I tried to explain to him that the price of $1.50 is clearly marked on the calendar and he said that they must have forgotten to put a sticker over the price. Every calander [sic] was marked with the $1.50 price tag. He said that per his corporate head quarters he could not give me the $1.50 price. I tried to explain to him that by law he is required to give me the lower price but he refused, but he did give me the full refund, but I

really wanted the calander [sic] [.]"

D. In August 2025, a Mississippi consumer complained, "Ever[y] time I go to buy something in this store they have it priced at a lower price than what it rings up at register[.] . . . [T]his item w[hi]ch was priced at $ 17.00 rings up at $22.00[.] And I asked why is it 22 and not 17 the guy asked the girl manager she explained to me that a lot of prices are going up we just don't have time to change them[.]"

E. In August 2025, a North Carolina consumer complained, "I purchased batteries from Family Dollar x 2 on 8/14/25. Listed price on shelf was $4. . . . At check out I was charged $4.25 plus 30 cents NC sales tax. I pointed out discrepancy to clerk. The clerk shrugged and I politiely [sic] stated dissatisfaction but did not press issue as she was young, kind, and probably powerless in this issue with Family Dollar."

F. In July 2025, a consumer reported that while shopping at a Family Dollar store in Euclid, Ohio, "several items had different prices on the labels or shelves compared to the prices charged at the register. Specifically, . . . a parade item was labeled as $1.25 but was charged $1.50, a hairbrush was labeled as $2.10 but was charged $2.65, and a Lipton iced tea was labeled as $1.25 but was charged $1.65."

G. In June 2025, a Maryland consumer complained, "[S]helf labels seem to differ from the price charged at the register. I wanted to purchase some coffee I saw that the price was within my budget 9.95 however whe[n] it was rung up it was 13.00 dollars."

H. In April 2025, a Maryland consumer complained, "I went to the Family Dollar today and purchased the item that was listed for one dollar when I went to the register, I noticed that the item was being priced at $1.25. I informed the manager that the price that was shown or listed above, the item was for a dollar not for $1.25. The manager then told me that she didn't change the price because she didn't have time to . . . [I] took a picture of what the item was priced at, but then the manager told me that I wouldn't be able to get a receipt or anything to show [what] the item run[g] up as[.]"

I. In March 2025, a Michigan consumer complained, "I was looking for candy to stuff Easter eggs. . . . One of the 'Easter variety mix 3/$3' was affixed to a box that had pink bags of candy labeled 'Sweet eatz Easter variety mix'. I grabbed 3 bags. When I was checking out, I noticed that they rang up $5 so I brought it to the cashier's (Carol) attention. She said the price would adjust at the end of the transaction. . . . When I got out to the car I looked at the receipt. I was charged $5 minus $1.67 for each bag. . . . I went back in the store, to the Easter candy shelves and double checked that I grabbed the right product. Yup[.] . . . I went back to the counter and approached Carol and told her that I was overcharged. She told me that I wasn't, that the total

monetary discount would be at the bottom of the receipt (there wasn't another discount other than the $1.67). She looked my receipt over and then got huffy and started walking over to the candy shelves. I pointed out the box that I pulled the bags from and the sticker that was affixed to it. She ripped the sticker off the box and said that a customer did that, that the sales tags are just randomly placed on the shelves and don't necessarily coincide with the box that they are near. . . ."

The consumer continued, "The next morning, I called and spoke with Chad, the manager. I told him that I was charged $5 minus the $1.67, which came out to $3.33/bag and that there was a sales tag affixed to the box that said 3/$3. He told me that no business would sell a $5 bag of candy for $1, it should have raised a red flag and I shouldn't have bought it. He also told me that the sales tags are just randomly placed on the shelves and the consumer has to pay attention to what they are purchasing. . . . He said, 'well, I'm not sure what you're looking for but you can bring the candy and receipt back and I'll refund your money.' I'm looking to not have to waste my time or gas going back. I'm looking for the candy to be sold at the price that was displayed."

J. In March 2025, a Massachusetts consumer complained, "Family [D]ollar is over charging for bags of candy that is clearly marked $1.25. When you get to register they are ringing $1.50. I showed them the tags that show price and refused to charge me the marked price."

K. In June 2024, a South Dakota consumer complained, "I picked up 3 12 packs of Dr. Pepper that was sitting on a sale sign that said 3 for 12 but . . . it never rings up correctly it's rings up as $8.50 times 3 which [is] $25.50 and it only takes 3 dollars off which leave it at $22.50 so not $12!!! It always happens to be the same lady she came up to the register and freaked out on me screaming that I always do this!! Um what do I always do[,] want the price that the sticker says[?] . . . She continues to scream at me in front of 20 people grabs the register and flips it around violently and starts pointing and saying it's correct[,] I'm the problem and I am no longer welcome there!"

L. In May 2025, a Florida consumer complained that a sheet set had been listed as $10.00, but rang up as $12.00. She pointed out the discrepancy and the manager refused to check the shelf price and ended up refusing to process the transaction with the customer.

58. When checking out, consumers sometimes notice the higher price being charged at the register and ask for the lower price to be applied. However, in many instances, Family Dollar employees refuse to correct the issue, as described in consumer complaints above.

59. When consumers check out, prices flash quickly on the screen and are difficult to track in the moment. Some consumers do not discover overcharges until after they are charged or even after they return home; others may never discover them at all. For example:

A. On June 19, 2026, a consumer sent a message to Family Dollar stating, "My cheese rang up full price. I didn't notice until I got home. I got four packs and they rang up $3.85 each not $2/4."

B. In November 2024, a Wisconsin consumer complained, "When I arrived there was a large sign on the left hand side of the door that said that the business was closing and there was 30% off. . . . I check my receipt upon arrival at home and found that I was only granted 20% off."

C. In April 2023, a consumer complained, "I shopped at my local family dollar in Ross[,] Ohio on Hamilton [C]leves rd. Upon returning home after wondering why my total was so high for the little stuff I bought. I realized I had been over charged for over half of the items. . . . The prices on the shelves are not correct."

D. In November 2025, a New York consumer said of Family Dollar: "I purchased my items under the impression they were one price just to go to be charged a completely higher price, which I didn't see until I went through my receipts nine hours later."

E. In May 2026, a Pennsylvania consumer complained, "The shelf price tag of a half-gallon of milk indicated $3.55. The cashier charged me $4.15. I paid (cash), then double checked the tag. I approached the cashier to ask why I was charged $4.15 rather than $3.55."

F. In March 2025, a Michigan consumer complained of being overcharged for candy with a three for $3 shelf label, noting, "When I got out to the car I looked at the receipt. I was charged $5 minus $1.67 for each bag." The consumer called the store manager and was told the store would not honor the advertised price.

**<u>Pricing Discrepancies in Family Dollar Stores Are Widespread</u>**

60. It is unlawful in all 50 states to advertise an inaccurate price. Consequently, numerous state and local government agencies conduct inspections to ensure pricing accuracy within retail establishments—inspections Family Dollar frequently fails.

61. In most jurisdictions, a store fails a pricing inspection if more than 2% of items

inspected have inaccurate price labels. Typically, state inspectors will randomly select 25, 50, or 100 products from different aisles and display areas within the store, then document whether the price label matches the register price for each product. These audit procedures are drawn from the methodology recommended by the National Institute of Standards and Technology ("NIST"), which has been adopted by the National Council on Weights and Measures.

62. State and local regulatory inspections following these standards have revealed widespread pricing inaccuracies at Family Dollar stores nationwide. For example:

63. ***Utah***: In pricing inspections conducted by the state of Utah from January 4, 2023, through April 17, 2026, Family Dollar stores failed 165 out of 350 inspections, roughly a **47%** failure rate. A Family Dollar store in Provo, Utah, had failed pricing inspections at least 29 times as of November 2025. Another store in Gunnison, Utah, failed twelve consecutive pricing inspections from March 16, 2023, through March 27, 2025. In two inspections of the Gunnison store, 12 or more items out of 25 were overcharges—approximately 50% of items scanned—while just one or two items were undercharges.

64. ***New Mexico***: For pricing inspections conducted from January 8, 2026, through April 13, 2026, New Mexico Family Dollar stores have failed 27 out of 46 pricing inspections, for a failure rate of **58.7%**. A Family Dollar store in Albuquerque has failed 17 separate pricing inspections since 2023, including four failures in 2026. As of April 2026, three other Family Dollar stores located in Albuquerque had failed each of their inspections in 2026.

65. ***Missouri***: From February 2, 2023, through October 27, 2025, Missouri conducted 70 pricing inspections in Family Dollar stores, of which 33 were failures, resulting in a **47.14%** failure rate.

66. ***Vermont***: From January 6, 2023, through February 10, 2026, the state of Vermont

conducted 41 pricing inspections in Family Dollar stores. Family Dollar failed 19 out of the 41 pricing inspections, for a failure rate over **46%**.

67. ***Ohio***: Family Dollar stores fail pricing audits at a high rate throughout the state of Ohio. In Cuyahoga County—the second most populated county in Ohio—Family Dollar stores failed more than **83%** of pricing inspections (93 out of 111 inspections) conducted between January 2023 and March 2026. During the same time period, Family Dollar failed more than **67%** of pricing inspections conducted in Columbus, Ohio, stores. A Family Dollar store in Garfield Heights, Ohio, failed nine consecutive pricing inspections in 2023 through 2025. Two different Family Dollar stores in Warrensville Heights, Ohio, each failed seven out of seven pricing inspections, with pricing error rates ranging from 10% to 60% of all items scanned. A Family Dollar store in University Heights, Ohio, failed six out of six pricing inspections. A summary prepared by Cuyahoga County shows that, from January 2023 through March 2026, pricing inspections of Family Dollar stores discovered 653 overcharges, compared to 298 undercharges. Nearly 12% of all 5,501 items scanned during inspections resulted in overcharges.

68. ***Mississippi***: From January 5, 2026, through April 15, 2026, Family Dollar stores in Mississippi had a pricing inspection failure rate of more than **36%**, failing 33 out of 90 pricing inspections.

69. ***Kansas***: From January 2023 through March 2026, Family Dollar failed 43 out of 52 pricing inspections at stores in Kansas, a failure rate of more than **82%**. In January 2026, Kansas issued a $25,000 civil penalty against Family Dollar after finding pricing violations in four separate inspections of a store in Kansas City.

70. ***Arizona***: From 2023 through 2025, Family Dollar stores in Arizona failed at least 111 out of 252 pricing inspections (over **44%** of pricing inspections). One store in Chandler,

Arizona, failed seven separate pricing inspections. Two other stores in Phoenix and another store in Tucson each failed four separate pricing inspections.

71. ***Florida***: From January 5, 2026, through February 27, 2026, Family Dollar stores failed seven out of 36 pricing inspections in Florida, for a failure rate of over 19%. Four of the failed inspections, all conducted at different store locations, involved inaccurate prices for 20% or more of the items inspected.

72. ***Oklahoma***: In January 2026, Oklahoma's Department of Agriculture, Food, and Forestry fined Family Dollar $8,500 after a Family Dollar store in Enid, Oklahoma, failed at least eight separate pricing inspections. At least five of the failed inspections identified ten or more overcharges.

73. ***North Carolina***: Family Dollar stores in North Carolina have failed at least 105 pricing inspections from 2023 through 2025. One Family Dollar store in Indian Trail, North Carolina, failed at least 14 pricing inspections. Another Family Dollar store in Ahoskie, North Carolina failed nine separate pricing inspections.

74. These repeated pricing inspection failures caused dozens of states to impose fines on Family Dollar. As shown in Figure 10, from 2022 to 2025, Family Dollar received more than 2,000 pricing fines, totaling nearly $3 million, from states across the nation. By October 2025, Family Dollar internally acknowledged, "Over the last four years, we have paid at least three (3) million dollars in fines/penalties related to pricing."




**Figure 10**

75. Multiple states have fined Family Dollar repeatedly, in some instances hundreds of times, for failing pricing inspections. For example:

76. ***Massachusetts***: Massachusetts fined Family Dollar 133 times in 2023 and 154 times in 2024, totaling $139,322.50 and $163,230, respectively. Family Dollar's records show that 74 different stores in Massachusetts received pricing fines in 2024. One store in Ashland, Massachusetts, received 20 pricing fines totaling $12,680, while another store in Somerset, Massachusetts, received 13 pricing fines totaling $35,700.

77. ***New York***: The State of New York issued pricing fines against Family Dollar at least 95 times in 2023 and 130 times in 2024, totaling $116,039.00 and $94,613.12, respectively. A Family Dollar store in Gouverneur, New York, was fined 26 times from 2022 through December 2025. In 2025, a Family Dollar Regional Director observed, "[T]he fact that Store #5866 has incurred 26 pricing-related fines since 2022 indicates a systemic issue rather than

isolated incidents."

78. ***Vermont***: From March 2023 through January 2026, Vermont issued 14 civil penalties against Family Dollar for pricing inaccuracy; the penalties totaled $204,000.

79. ***North Carolina***: North Carolina issued Family Dollar pricing fines totaling $115,175 in 2024.

80. The substantial fines levied against Family Dollar underrepresent the full scope of Family Dollar's pricing inaccuracies because only a fraction of failed state pricing inspections result in a fine. Frequently, states impose penalties only after repeated pricing audit failures.

81. In addition to Family Dollar's many state pricing-inspection failures, the FTC's investigation documented false pricing representations at Family Dollar stores. For example, an FTC investigator made undercover purchases at Family Dollar stores in Ohio and Pennsylvania. Both undercover purchases resulted in Family Dollar charging more at the register than the price advertised for multiple products. During a January 16, 2026, undercover purchase at a Family Dollar store in Euclid, Ohio, an FTC investigator was overcharged on 15 out of the 50 items that she purchased (30%). During a March 11, 2026, undercover purchase in Pittsburgh, Pennsylvania, an FTC investigator was overcharged for 8 out of 50 items that she purchased (16%). The FTC investigator used a credit card to make both purchases.

82. Family Dollar's own records also demonstrate that the company's stores continue to fail state pricing inspections at a high rate. In April 2026, Family Dollar's analysis determined that its stores were failing an increasing amount of pricing inspections each month from January through March 2026. Family Dollar failed 40% of pricing inspections in January 2026, 57% of inspections in February 2026, and 59% of inspections in March 2026.

83. State audit reports and Family Dollar's internal records show that essential

household items are often affected by Family Dollar's false pricing representations. Specifically, Family Dollar routinely falsely advertises a lower price than it charges at the register for milk, cereal, batteries, diapers, feminine products, toilet paper, and laundry detergent. Family Dollar's internal audits have also noted that pricing violations affect milk, eggs, and other food.

**Family Dollar Has Faced Regulatory Scrutiny Due to Its False Prices**

84. Since 2024, Family Dollar has reached settlements with three state Attorneys General and consumer protection agencies regarding Family Dollar's pricing inaccuracies.

85. In February 2024, Family Dollar reached a $400,000 settlement with Ohio.

86. In January 2025, Family Dollar reached a $113,960 settlement with Wisconsin.

87. In May 2025, Family Dollar reached a $300,000 settlement with Arizona.

88. All three state consent judgments also included injunctive relief designed to improve Family Dollar's pricing policies and ensure Family Dollar's compliance with such policies. For example, all three consent judgments required Family Dollar to post a sign in each store clearly stating that, in the event that the price charged at the register is higher than the price posted on the shelf, the customer is entitled to pay the lower price or receive a refund for the price difference. The judgments also included provisions requiring pricing audits, recordkeeping, and employee training.

89. Internal documents show that Family Dollar has not fully complied with all requirements in the consent judgments.

90. In an internal presentation dated January 13, 2026—nearly two years after entering into the Ohio Consent Judgment—Family Dollar summarized themes from recent Ohio pricing site visits, including that, "In general, stores were not aware [of] and following the Consent Agreement. For example: No signage on stores or POS; Store managers were mostly

unaware of monthly pricing audit obligation; District Managers were not doing full pricing audit every eight weeks."

91. Despite executing the settlement agreement with Wisconsin in January 2025, Family Dollar's internal records reflect that it took months for the company to make store-level employees aware of the settlement and how to comply with it. Specifically, Family Dollar noted internally that store employees did not have "awareness" of the settlement until September 2025 and "focused actions" toward compliance were not in place until December 2025.

92. An internal Family Dollar presentation, dated March 31, 2026, notes upcoming plans for "the weeks of April 13 and April 20 to improve execution" under the existing consent judgments. The upcoming efforts would include sending "store signage to Ohio and Wisconsin for posting at register stating the Company's policy to honor the lower price where there is a difference between the shelf tag and the price at the POS."

93. Internal audits Family Dollar conducted in April 2026 showed that 64 stores in Ohio still did not have the pricing policy sign at the register as required by Family Dollar's February 2024 consent judgment with Ohio.

**Family Dollar's Own Audits Demonstrate It Has Made False Pricing Claims**

94. Family Dollar's internal monitoring of pricing procedures in late 2025 and early 2026 highlighted ongoing failures related to large-scale pricing discrepancies. The results of Family Dollar's internal pricing audits mirror the findings observed during state pricing inspections. For example:

95. ***Massachusetts***: After facing scrutiny from the state of Massachusetts, Family Dollar began conducting its own pricing audits in Massachusetts stores.

96. In December 2025, Family Dollar personnel conducted a round of audits at ten

separate stores in Massachusetts and all ten failed. The best-performing store had four mispriced items scanned during the audit, whereas another store had more than 19 items inaccurately priced and received an audit score of 64%. Additionally, audits of at least five other stores detected 10 or more mispriced items.

97. In another round of audits of six Massachusetts stores taking place in December 2025, all six stores failed. The highest-performing store still had seven mispriced items identified during the audit. One store's audit identified 24 pricing errors.

98. ***Arizona***: In February 2026, a pricing-accuracy audit performed at a store in Phoenix, Arizona identified 27 incorrectly priced items out of a sample of 100.

**Family Dollar Disregards Persistent Pricing Inaccuracies at Its Stores**

99. Despite numerous notifications of pricing errors across its stores, Family Dollar has not consistently prevented or corrected these errors. Family Dollar's own policies and internal communications show gaps in how pricing accuracy is monitored and addressed, which contributes to recurring shelf-to-register pricing mismatches in its stores.

***Family Dollar Updates Prices at the Point of Sale Without Ensuring Shelf Labels Are Updated***

100. Family Dollar maintains multiple pricing policies and procedures that do not prevent pricing errors; several, in fact, cause errors. Chief among them is Family Dollar's practice of updating prices at the POS without first confirming that updated price labels have been placed on store shelves. Oftentimes, the price labels on shelves have *not* been updated by the time prices are changed at the POS, because it is difficult for store employees to keep up with the frequent price changes rolled out by Family Dollar corporate.

101. Family Dollar updates POS prices on both monthly and weekly cadences, even though its stores have difficulty applying and updating the corresponding labels in a timely

manner. On a monthly basis, Family Dollar sends a physical "schematic kit" containing new price tags and labels to each store, and gives on-site store managers approximately three weeks to apply the new price labels in the store. Once an on-site store manager installs an updated price label, that manager manually activates the new price at the POS. However, approximately three weeks after sending out the monthly schematic kits, Family Dollar corporate automatically updates the prices at the POS on a system-wide basis, regardless of whether stores have affixed the updated labels on shelves or products.

102. Weekly "In-Store Pricing" ("ISP") updates operate similarly. On a weekly basis, Family Dollar sends electronic ISP updates to stores, and each store's on-site manager is expected to print out the labels for any ISP price updates and affix the new labels to store shelves. The new ISP price labels are not made available to store employees until noon on Mondays, and the store employees are expected to print and place the new price labels on shelves by close of business on Tuesday. Once the new labels are affixed, the store employees manually activate the new price at the POS; otherwise the corresponding new prices are automatically updated at the POS on Saturday of the same week, again regardless of whether stores have printed and affixed the labels.

103. Family Dollar is aware that its employees routinely do not and cannot apply updated price labels to the shelves before prices are automatically updated at the register. On internal documents, Family Dollar refers to these "Forced (Automatic) [Price] Activation Date[s]" as "High Risk." Nevertheless, Family Dollar does not have measures in place to prevent prices from automatically updating in instances where new price labels have not been put in place in the store.

104. On-site store managers have informed Family Dollar corporate employees of the

numerous barriers to maintaining accurate price labels in store, yet Family Dollar continues to use the same problematic pricing procedures. For example, during in-store audits conducted in April 2026, store managers were asked to identify what "barrier(s) are you and your Store Teams having in regard to Pricing Accuracy Execution." As shown in the spreadsheet documenting the audit results, store managers consistently identified the same barriers, including insufficient staffing, excessive price changes, early price activations by corporate, and inadequate communication from corporate regarding price changes. Specifically, employees provided the following responses:

A. "I believe the prices in New schematic sections are being activated by corporate prior to us or third party being able to set the new schematic sections."

B. "Prices change so quickly"

C. "Lots of stickers every month"

D. "Activating early can cause some issues."

E. "Corporate activating pricing before they are due is the issue we see commonly"

F. "[T]he sale prices do not always ring correctly"

G. "Not enough labor budget to execute along side daily operations"

H. "Prices changing in the [point of sale] and the team not being notif[ied] or have the prices"

I. "[B]efore corporate change prices in the register system make sure all prices are accurate on sales floor in stores"

J. "Merchandise gets marked up (and down) without warning. Sometimes the

sales ad price isn’t correct or the coupons don’t work.”

K. “To[o] many price changes to[o] often. [N]ot enough time to execute[.]”

L. “Price changes are activated automatically in the system before the schematic is set and due”

M. “[E]arly activation . . . too many price changes period.”

N. “[We] change the sticker & activate, then they still don’t match and we as the store get in trouble, because we have to price override.”

105. Numerous consumers have reported that Family Dollar employees admitted that false pricing is due to failures to put up new price labels in the store. For example, one such consumer said, “I asked why is it 22 and not 17 . . . the girl manager [ ] explained to me that a lot of prices are going up we just don't have time to change them[.]” *See supra* Paragraph 57.

106. Family Dollar also tracks statistics on whether its stores have printed pricing labels. The statistics show that many stores print the price labels late or do not print them at all. Because Family Dollar automatically changes register prices through centralized software but uses printed labels on the shelves, a store that does not print the labels following a pricing change necessarily has incorrect price labels on the shelves, often resulting in overcharges at the register.

107. Company reports confirm the scope of the problem. A report from September 2023 shows that 156 stores had not printed new price labels for that week’s ISP updates. Of those 156 stores, 80 stores marked the printing task as completed in Family Dollar’s internal tracking system “but printed zero labels.” The same report showed that 27 stores had not printed labels “for at least two consecutive weeks.” Similarly, an August 2023 report noted that 188 stores marked the printing task as completed “but printed zero labels.”

108. On January 10, 2026, a Saturday, 1,040 Family Dollar stores had not printed ISP

labels for the week. Considering Family Dollar's procedure of automatically updating ISPs at the point of sale on Saturday, all 1,040 stores were seemingly charging customers updated prices at the register, while outdated and thus false price labels remained on the shelves.

***Family Dollar's Failure to Honor Prices Advertised on Its Website and Mobile App***

109. As consumer complaints demonstrate, *see, e.g.*, Paragraphs 41, 55-58, Family Dollar frequently fails to follow its stated policy to "honor the lower price" when a discrepancy arises between the price on the shelf label and the price at the register. Moreover, even that poorly followed policy does not apply to prices advertised in Family Dollar's mobile app or website.

110. In December 2024, with regard to a recent customer complaint about a store manager refusing to honor a price advertised on Family Dollar's app, a Family Dollar Director of Digital Operations advised other employees: "We do not have a digital price matching policy in place. In fact, we do just the opposite by displaying pricing varies by store on our websites. . . . However, in the mobile apps, we do not explicitly state that the prices may vary, but we have sections in our [Terms & Conditions]."

111. Family Dollar has not changed its digital price matching policy even though it has received complaints that the prices advertised on Family Dollar's website and mobile app differ in some cases from the prices charged in store.

112. As of August 2026, Family Dollar's Terms and Conditions still include a disclaimer stating that, among other things, "Occasionally there may be information on our App that contains typographical errors, inaccuracies or omissions that may relate to product descriptions, pricing, promotions, offers, . . . or that may be inaccurate or incomplete in other respects. We are not responsible if information on this App is inaccurate, incomplete, or

outdated. Any reliance on the material on this App is at your own risk."

113. As set out, *supra*, many consumers complain that prices advertised on Family Dollar's mobile app are not honored when shopping in store. In February 2026, Family Dollar employees reported during internal pricing audits, "App prices often don't match – they get a lot of customer complaints about it (even tho[ugh] it says prices may vary)."

***Internal Communications Show That Family Dollar Has Had Little Concern for Pricing Accuracy Over the Years***

114. It was not until the fall of 2025—after Family Dollar had already entered into consent judgments and received notice of the impending publication of a December 2025 *Guardian* article—that employees at Family Dollar's corporate offices devoted more attention and resources to addressing state pricing inspections. Before that time, Family Dollar's corporate offices did not systematically track pricing inspection results, instead tracking only when states fined the company for pricing inaccuracies. As described above, because states generally do not impose fines for every failed pricing inspection, tracking only fines rather than all inspection failures significantly under-represents the problem.

115. For example, in a November 18, 2025, email, a Family Dollar Director of Ops Field Compliance and Store Operations described her attempts to verify allegations from the *Guardian* reporter that a Family Dollar store in Provo, Utah, failed thirteen separate pricing inspections from November 15, 2024, through October 1, 2025. Because Family Dollar did not have a reliable system for tracking the results of pricing audits, the Director was only able to find records for just *five* failed pricing inspections from 2022 through 2025 for the Provo store, even though the store failed dozens of pricing audits during that time period.

116. By December 2025, the impending *Guardian* article caused Family Dollar

employees to pay new attention to pricing. In one December 2025 email, a Family Dollar corporate employee complained about senior management's inquiry into recurrent Massachusetts pricing fines, commenting that "none of this is within the last 60 days." In another December 2025 email, one Family Dollar Zone Vice President (an upper-level manager responsible for approximately 1,200 stores in a multi-state region) described steps that were being taken to improve pricing accuracy "[e]ver since the fines became more relevant." Also in December 2025, a compliance director listed action items, including to "retrain the store staff so that they are aware they can honor the lower price / provide reimbursement at the store."

117. Nevertheless, Family Dollar has not sufficiently modified its pricing policies and procedures to address pricing inaccuracies in Family Dollar stores.

118. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendant is violating or is about to violate laws enforced by the Commission because, among other things: Defendant has failed thousands of pricing inspections and Family Dollar stores continue to routinely fail inspections in 2026; the Commission's investigators found mislabeled pricing at Family Dollar stores in 2026; and the company has caused millions of dollars in harm.

## VIOLATIONS OF THE FTC ACT

119. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

120. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT I

### Misrepresentations to Consumers Regarding Product Prices

121. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of goods in its retail stores, Defendant represents, directly or indirectly, expressly or by implication, that purchasers will be charged the advertised price, including in advertisements, circulars, on its website and mobile application, on the product itself, on signs affixed near the product, or in shelf prices.

122. In fact, in numerous instances in which Defendant has made the representations described in Paragraph 121, consumers are charged more than the advertised price.

123. Therefore, Defendant's representations as described in Paragraph 121 are false or misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE GRAMM-LEACH-BLILEY ACT

124. Section 521 of the GLB Act, 15 U.S.C. § 6821, became effective on November 12, 1999, and remains in full force and effect. Section 521(a)(2) of the GLB Act, 15 U.S.C. § 6821(a), prohibits any person from "obtain[ing] or attempt[ing] to obtain, or caus[ing] to be disclosed or attempt[ing] to cause to be disclosed to any person, customer information of a financial institution relating to another person . . . by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution."

125. The GLB Act defines "customer" to mean, "with respect to a financial institution, any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as a fiduciary." 15 U.S.C. § 6827(1). The GLB Act defines "customer information of a financial institution" as "any information maintained by or

for a financial institution which is derived from the relationship between the financial institution and a customer of a financial institution and is identified with the customer." *Id.* § 6827(2). The GLB Act defines a "financial institution" to include "any institution engaged in the business of providing financial services to customers who maintain a credit, deposit, trust, or other financial account or relationship with the institution." *Id.* § 6827(4)(A).

126. Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a), empowers the FTC to enforce Section 521 of the GLB Act "in the same manner and with the same power and authority as the [FTC] has under the Fair Debt Collection Practices Act [FDCPA] . . . to enforce compliance with such Act." Pursuant to Section 814(a) of the FDCPA, 15 U.S.C. § 1692*l*(a), a violation of the FDCPA is deemed an unfair or deceptive act or practice in violation of the FTC Act. Section 814(a) of the FDCPA further provides that all of the functions and powers of the FTC under the FTC Act are available to the FTC to enforce compliance by any person with the FDCPA, including the power to enforce provisions of the FDCPA in the same manner as if the violation had been a violation of an FTC trade regulation rule. Thus, pursuant to Section 522(a) of the GLB Act, the FTC may enforce Section 521 of the GLB Act in the same manner as if a violation of the GLB Act were a violation of an FTC trade regulation rule.

127. Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the GLB Act, including, but not limited, to the rescission or reformation of contracts, and the refund of money or return of property.

**COUNT II**

**Use of False, Fictitious, or Fraudulent Statements to Obtain or Attempt to Obtain, or Cause to Be Disclosed or Attempt to Cause to Be Disclosed, Customer Information of a Financial Institution**

128. In numerous instances in connection with the advertising, marketing, promotion, or operation of its retail stores, Defendant has made false, fictitious, or fraudulent statements or representations to customers of financial institutions to obtain or attempt to obtain, or to cause to be disclosed or attempt to cause to be disclosed to a person, customer information of a financial institution, namely information from their credit and debit cards and checks that contain the customer's bank account information, including by representing, directly or indirectly, expressly or by implication, that consumers will be charged the advertised price, including in advertisements, circulars, on the company's website and mobile application, on the product itself, on signs affixed near the product, or in shelf prices.

129. Therefore, Defendant's acts or practices set forth above violate Section 521 of the GLB Act, 15 U.S.C. § 6821.

**VIOLATIONS OF ALABAMA LAW**

**COUNT III**

**Deceptive Trade Practices**

130. The State of Alabama incorporates Paragraphs 2 through 10, Paragraph 12, and Paragraphs 29 through 118 as if they were fully alleged herein.

131. Alabama's Deceptive Trade Practices Act forbids certain "deceptive acts or practices in the conduct of any trade or commerce." Ala. Code § 8-19-5. The term "trade or commerce" "[i]ncludes, but is not limited to, the advertising, buying, offering for sale, sale or

distribution or performance of any service or goods, and any other article, commodity, or thing of value wherever situated and shall include any trade or commerce affecting the people of this state." Ala. Code § 8-19-3(8). Defendant's business operations, as described above, constitute trade or commerce under the Deceptive Trade Practices Act. *See id.*

132. The misrepresentations regarding pricing that Defendant makes in connection with the advertising, marketing, and promotion of its products through its paper and digital advertisements have the capacity, tendency, or effect of deceiving or misleading consumers, and they are therefore deceptive trade practices prohibited by Section 8-19-5(9) of the Code of Alabama, which prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

133. Likewise, the misrepresentations that Defendant makes in-store with regard to the prices of goods offered for sale violate Section 8-19-5(27) of the Code of Alabama, which prohibits "[e]ngaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

## VIOLATIONS OF ARKANSAS LAW

## COUNT IV

### Violations of the Arkansas Deceptive Trade Practices Act

134. Plaintiff State of Arkansas realleges and incorporates by reference the allegations made in Counts I through II.

135. The Arkansas Deceptive Trade Practices Act prohibits "knowingly making a false representation as to the characteristics…of goods or services." Ark. Code Ann. § 4-88-107(a)(1).

136. Defendant knowingly made false representations regarding the price of goods in advertisements, circulars, on its website and mobile application, on the product itself, on signs

affixed near the product, or in shelf prices.

137. Therefore, Defendant's acts or practices violate Ark. Code Ann. § 4-88-107(a)(1).

138. The Arkansas Deceptive Trade Practices Act prohibits the advertisement of goods or services "with the intent not to sell them as advertised." Ark. Code Ann. § 4-88-107(a)(3).

139. Defendant advertised goods in advertisements, circulars, on its website and mobile application, on the product itself, on signs affixed near the product, or in shelf prices at prices for which it did not intend to sell them.

140. Therefore, Defendant's acts or practices violate Ark. Code Ann. § 4-88-107(a)(3).

141. The Arkansas Deceptive Trade Practices Act prohibits the "act, use, or employment by a person of any deception, fraud, or false pretense" in connection with the advertisement or sale of goods or services. Ark. Code Ann. § 4-88-108(a)(1).

142. Advertising goods at a price for which one does not intend to sell the goods is the use of deception, fraud, or false pretense in connection with the advertisement of such goods.

143. Defendant advertised goods at a price for which it did not intend to sell the goods.

144. Therefore, Defendant's acts or practices violate Ark. Code Ann. § 4-88-108(a)(1).

145. The Arkansas Deceptive Trade Practices Act prohibits "engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(a)(10).

146. Defendant's practices relate to business, commerce, or trade.

147. Defendant's advertising practices intentionally promote a deceptive price for goods in advertisements, circulars, on its website and mobile application, on the product itself, on signs affixed near the product, or in shelf prices in order to gain business it might not have had, had consumers known the true price of the goods.

148. Defendant's pricing practices are deceptive and unconscionable in violation of Ark. Code Ann. § 4-88-107(a)(10).

**VIOLATIONS OF COLORADO LAW**

**COUNT V**

**Violations of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1)(l)**

**(Deceptive Acts or Practices)**

149. The Colorado Attorney General re-alleges and incorporates the preceding paragraphs as if they are fully alleged herein.

150. Defendant made false statements of fact concerning the price of its goods. C.R.S. § 6-1-105(1)(l).

151. Specifically, during the time period described in this Complaint, Defendant represented, directly or indirectly, expressly or by implication that consumers could purchase goods from Defendant at prices displayed on its shelves, in its digital advertisements, and on its phone application.

152. In fact, these representations were false, misleading, or not substantiated at the time the representations were made.

153. When Defendant performed the deceptive trade practices described in the preceding paragraphs, it did so in the course of its business, vocation, or occupation.

154. The deceptive acts or practices alleged herein constitute separate violations of the Colorado Consumer Protection Act. By engaging in the acts and practices alleged herein, Defendant violated the Colorado Consumer Protection Act. C.R.S. § 6-1-105(1)(l).

**VIOLATIONS OF FLORIDA LAW**

**COUNT VI**

**Violations of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA)**

155. As set forth in Paragraphs 2 through 10, Paragraph 15, and Paragraphs 29 through 118, which allegations are incorporated as if set forth herein, in the course of Defendant's trade or commerce, Defendant has committed acts and practices that are unfair or deceptive in violation of FDUTPA.

156. Section 501.204(1), Florida Statutes, provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

157. Section 501.203(8), Florida Statutes, defines "trade or commerce" as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. 'Trade or commerce' shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity."

158. Defendant, in connection with the advertising, marketing, promotion, offering for sale, or sale of goods in its retail stores, represents, directly or indirectly, expressly or by implication, that consumers will be charged the prices set forth in its advertisements, circulars, website, mobile applications, on the products themselves, on signs affixed near products, or on shelf prices.

159. However, on numerous occasions, consumers are not charged the prices reflected in Defendant's numerous marketing tools, but rather prices in excess of the advertised amounts.

160. Defendant's misrepresentations and unfair inducements as set forth above, are

false and misleading and constitute a deceptive act or practice in violation of Section 501.204(1), Florida Statutes.

161. Defendant is subject to civil penalties for willful violation of FDUTPA in the amount of Ten Thousand Dollars ($10,000) for each violation under Section 501.2075, Florida Statutes, and Fifteen Thousand Dollars ($15,000) for each violation that victimized or attempted to victimize a senior citizen or person who has a disability pursuant to Section 501.2077, Florida Statutes. A willful violation occurs when the person knew or should have known that his or her conduct was unfair or deceptive.

162. The above-described acts and practices of Defendant have injured and will likely continue to injure and prejudice the public.

163. The acts and practices of Defendant as set forth herein are misleading or deceptive and likely to mislead consumers acting reasonably; and consumers within the State of Florida and elsewhere were actually misled by the acts and practices of Defendant recited herein.

164. Defendant has willfully engaged in the acts and practices alleged herein when it knew or should have known that such acts and practices were unfair or deceptive or otherwise prohibited by law.

165. Unless Defendant is permanently enjoined from engaging further in the acts and practices complained of herein, Defendant's actions will result in irreparable injury to the public for which there is no adequate remedy at law.

## VIOLATIONS OF ILLINOIS LAW

### The Illinois Consumer Fraud Act

166. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ILCFA") states, in relevant part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" … in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

167. Section 7 of the Consumer Fraud Act provides:

> (a) Whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by the Act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the State against such person to restrain by preliminary or permanent injunction the use of such method, act or practice. The Court, in its discretion, may exercise all powers necessary, including by not limited to: injunction, revocation, forfeiture or suspension of any license, charter, franchise, certificate or other evidence of authority of any person to do business in this State; appointment of a receiver, dissolution of domestic corporations or association suspension or termination of the right of foreign corporation or associations to do business in this State; and restitution.
>
> (b) In addition to the remedies provided herein, the Attorney General may request and this Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act. In the event the court finds the method, act or practice to have been entered into with the intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 per violation.
>
> (c) In addition to any other civil penalty provided in this Section, if a person is found by the court to have engaged in any method, act, or practice declared unlawful under this Act, and the violation was committed against a person 65 years of age or older, the court may impose an additional civil penalty not to exceed $10,000 for each violation.

815 ILCS 505/7.

168. Section 10 of the ILCFA provides, "[i]n any action brought under the provisions of this Act, the Attorney General is entitled to recover costs for the use of this State." 815 ILCS 505/10.

**Illinois Uniform Deceptive Trade Practices Act**

169. Section 2 of the Illinois Uniform Deceptive Trade Practices Act provides, in relevant part, the following:

(a) a person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:

(9) advertises goods or services with intent not to sell them as advertised;

***

(11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

***

(12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

815 ILCS 510/2(a).

(b) In order to prevail in an action under this Act, a plaintiff need not prove competition between the parties or actual confusion or misunderstanding.

815 ILCS 510/2(b).

**<u>COUNT VII</u>**

**Violations of The Illinois Consumer Fraud Act**

170. The People of the State of Illinois re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

171. In numerous instances in the course of trade or commerce, Defendant engaged in unfair or deceptive acts and practices declared unlawful by Section 2 of the ILCFA with the intent that consumers rely on them.

172. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of goods in its retail stores, Defendant represented, directly or indirectly, expressly or by implication, that purchasers will be charged the advertised price, including in advertisements, circulars, on the company's website and mobile application, on the product itself, on signs affixed near the product, or on shelf prices, yet consumers were charged more than the advertised price at the point of sale.

## COUNT VIII

### Violations of the Illinois Uniform Deceptive Trade Practices Act

173. The People of the State of Illinois re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

174. Defendant has in numerous instances engaged in deceptive trade practices in violation of Section 2 of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, by:

A. Advertising goods with intent not to sell them at the advertised price in circulars, in store, and on the Family Dollar website and app, in violation of 815 ILCS 510/2(a)(9).

B. Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions for goods available for purchase at Family Dollar stores, in circulars, in store, and on the Family Dollar website and app, in violation of 815 ILCS 510/2(a)(11).

C. Creating a likelihood of confusing or misunderstanding by misrepresenting the price of goods available for purchase at Family Dollar stores in circulars, in store, and on the Family Dollar website and app, in violation of 815 ILCS 510/2(a)(12).

**VIOLATIONS OF IOWA LAW**

**<u>COUNT IX</u>**

**The Iowa Consumer Fraud Act**

175. Plaintiff State of Iowa re-alleges and incorporates every allegation set forth in the preceding paragraphs.

176. The Iowa Consumer Fraud Act makes unlawful "[t]he act, use or employment by a person of an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission, in connection with the lease, sale, or advertisement of any merchandise . . . whether or not a person has in fact been misled, deceived, or damaged." Iowa Code §714.16(2)(a).

177. The Iowa Attorney General is authorized to bring an action against any person who violates the Iowa Consumer Fraud Act for injunctive relief, reimbursement for consumers, disgorgement of all ill-gotten revenues, civil penalties, and attorneys' fees and costs. Iowa Code §§714.16 (7) and (11).

178. Defendant's acts, practices, or omissions as alleged herein have occurred with respect to business done in Iowa and have affected Iowa consumers.

179. Defendant's acts, practices, or omissions as alleged herein are unlawful under the Iowa Consumer Fraud Act. *See* §714.16(2)(a).

## VIOLATIONS OF KANSAS LAW

## COUNT X

180. The State of Kansas hereby repeats and incorporates by reference all other allegations of this complaint.

181. Defendant is a "[s]upplier," as defined by K.S.A. 50-624(l), who engages and/or engaged in "[c]onsumer transaction(s)," as defined by K.S.A. 50-624(c), with Kansas "[c]onsumer(s)," as defined by K.S.A. 50-624(b).

182. The Kansas Consumer Protection Act, K.S.A. 50-626(b)(2), prohibits deceptive acts and practices in connection with a consumer transaction, whether or not any consumer has in fact been misled, wherein the supplier willfully uses or used, in any oral or written representation, an exaggeration, falsehood, innuendo or ambiguity as to a material fact.

183. The Kansas Consumer Protection Act, K.S.A. 50-626(b)(3), also prohibits deceptive acts and practices in connection with a consumer transaction, whether or not any consumer has in fact been misled, wherein the supplier willfully fails or failed, to state a material fact, or willfully conceals, suppresses, or omits a material fact.

184. Defendant has made the representations described in Paragraph 121 to Kansas consumers, who are then charged more than the advertised price.

185. An advertised price is a material fact in a consumer transaction.

186. Defendant's willful use in representations as described in Paragraph 121, are false or misleading and constitute a deceptive act or practice in violation of the Kansas Consumer Protection Act, K.S.A. 50-623 *et seq*.

**VIOLATIONS OF LOUISIANA LAW**

**COUNT XI**

**Violations of the Unfair Trade Practices and Consumer Protection Law (La. R.S. 51:1401 *et seq.*) and False Advertising Law (La. R.S. 51:411 *et seq.*)**

187. The State of Louisiana reasserts and re-alleges all allegations set forth in this complaint as if fully incorporated herein.

188. The Attorney General of the State of Louisiana brings action in the public interest of the State of Louisiana to seek permanent injunctive relief, restitution, and civil penalties against Family Dollar Stores, LLC pursuant to the Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401, *et seq.* ("LUTPA"). The Attorney General has the constitutional and statutory authority to bring this action on behalf of the public pursuant to LUTPA.

189. La. R.S. 51:1405(A) provides "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

190. False Advertising Law, La. R.S. 51:411 (A) provides:

> No person, with intent to sell or in any way dispose of merchandise, securities, service, or anything directly or indirectly, to the public for sale or distribution, or with intent to increase the consumption, or to induce the public in any manner to enter into any obligation relating thereto, … shall make, publish, disseminate, circulate, or place before the public, or cause directly or indirectly to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper or other publication, or in the form of a book, notice, hand-bill, poster, bill, circular, pamphlet, or letter, or radio broadcasts, telecasts, wire, wireless, motion picture, or in any other way, an advertisement of any sort regarding merchandise, securities, service, or anything offered to the public, which advertisement contains any assertion, representation, or statement of fact which is untrue, deceptive, or misleading.

191. Defendant, during the course of its business activities and at all times pertinent to the present litigation, conducted its business in Louisiana and committed unfair or deceptive trade practices as described herein, in violation of the Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401, *et seq.* and the False Advertising Law, La. R.S. 51:411, *et seq.* Defendant's acts and practices negatively affect Louisiana consumers, particularly consumers in rural and underserved communities in which Defendant's stores are located and to which Defendant markets and sells its products.

192. Defendant published, disseminated, circulated, and placed before the public advertisements of its product pricings as alleged herein to Louisiana consumers that were untrue, deceptive, or misleading with the intent to sell merchandise and to increase the consumption of its products in violation of the False Advertising Law, La. R.S. 51:411 *et seq.*

193. Defendant has made representations about product pricings to Louisiana consumers, then charged consumers more than the advertised price.

194. Defendant's misrepresentations, acts, practices, or omissions as described herein are unlawful and constitute an unfair or deceptive act or practice in violation of the Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401 *et seq.* and the False Advertising Law, La. R.S. 51:411 *et seq.*

195. The State of Louisiana is entitled to and seeks permanent injunctive relief related, but not limited, to the conduct alleged pursuant to La. R.S. 51:1407.

196. The State of Louisiana is further entitled to and seeks civil penalties for each violation of Louisiana law pursuant to La. R.S. 51:1407.

197. The State of Louisiana is entitled to and seeks all additional orders against the Defendant including restitution to Louisiana consumers pursuant to La. R.S. 51:1408, attorney's

fees and costs incident to this action together with legal interest until final payment, and all general and other relief the Court finds that justice may require or is otherwise equitable.

198. The State of Louisiana is entitled to and seeks fines not less than five hundred dollars nor more than twenty-five hundred dollars for each offense of false advertising pursuant to La. R.S. 51:411(E).

**VIOLATIONS OF MISSISSIPPI LAW**

**COUNT XII**

**Violations of the Mississippi Consumer Protection Act ("MCPA")**

**Miss. Code Ann. § 75-24-1 *et seq.***

199. Plaintiff, the State of Mississippi, incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

200. Defendant engaged in unfair methods of competition affecting commerce and engaged in unfair or deceptive trade practices in or affecting commerce in violation of Miss. Code Ann. § 75-24-5(1). Defendant engaged in the following specific unfair or deceptive trade practice in or affecting commerce in violation of Miss. Code Ann. § 75-24-5(2):

> "(i) Advertising goods or services with intent not to sell them as advertised; … (k) Misrepresentations of fact concerning the reasons for, existence of, or amounts of price reductions;"

201. Defendant committed a separate and independent violation of the MCPA through each and every unfair, deceptive, false or misleading representation. The State of Mississippi seeks injunctive relief pursuant to Miss. Code Ann. §75-24-9, restitution pursuant to Miss. Code Ann. § 75-24-11, civil penalties pursuant to Miss. Code Ann. §75-24-19, and any and all other relief allowable by law, because Defendant knowingly and willfully used unfair or deceptive

trade practices, methods or acts prohibited by Miss. Code Ann. § 75-24-5.

**VIOLATIONS OF NEBRASKA LAW**

**COUNT XIII**

202. Plaintiff Nebraska re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

203. The Nebraska Uniform Deceptive Trade Practices Act ("NE UDTPA") specifies multiple acts or practices which, when conducted in the course of business, constitute deceptive trade practices, including but not limited to:

a. "Advertises goods or services with intent not to sell them as advertised or advertises the price in any manner calculated or tending to mislead or in any way deceive a person" in violation of Neb. Rev. Stat. § 87-302(a)(10).

b. "Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" in violation of Neb. Rev. Stat. § 87-302(a)(12).

c. "Uses any scheme or device to defraud by means of: (i) [o]btaining money or property by knowingly false or fraudulent pretenses, representations, or promises" in violation of Neb. Rev. Stat. § 87-302(a)(16).

204. The Attorney General is authorized to bring an action against any person who violates NE UDTPA for injunctive relief, restitution for Nebraska consumers, and civil penalties. Neb. Rev. Stat. § 87-303.05 and Neb. Rev. Stat. § 87-303.11.

205. As alleged in the preceding paragraphs, Defendant has engaged in numerous instances of conduct that constitute deceptive trade practices under NE UDTPA, *see* Neb. Rev. Stat. § 87-302(a), including but not limited to: (1) advertising goods with intent not to sell them

at the advertised price; (2) making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions for goods available for purchase; and (3) obtaining money or property from customers by knowingly false or fraudulent pretenses, representations, or promises.

206. Defendant's deceptive trade practices have affected the people of the State of Nebraska.

207. Each instance of a deceptive act or practice as alleged herein constitutes a separate violation of the NE UDTPA for which the Court should order up to $2,000 civil penalty per violation under Neb. Rev. Stat. § 87-303.11(1).

208. The Court should award all relief allowable under NE UDTPA against Defendant, including injunctive relief, restitution for Nebraska consumers, and civil penalties for each violation. Neb. Rev. Stat. § 87-303.05 and Neb. Rev. Stat. § 87-303.11.

## VIOLATIONS OF OHIO LAW

## COUNT XIV

### Violations of Ohio's Consumer Sales Practices Act

209. Plaintiff Ohio re-alleges and incorporates every allegation set forth in all other paragraphs.

210. The Ohio Consumer Sales Practices Act ("Ohio CSPA"), O.R.C. 1345.01 *et seq.*, and its Substantive Rules, Ohio Adm. Code 109:4-3-01 *et seq.*, specify that certain acts or practices by a supplier constitute an unfair or deceptive act or practice when made as a part of a consumer transaction.

211. Defendant is a "supplier" as defined in the Ohio CSPA, O.R.C. 1345.01(C), because Defendant engages in the business of effecting or soliciting "consumer transactions" by

selling goods to "consumers" for purposes that are primarily personal, family, or household, as defined in O.R.C. 1345.01(A) and (D).

212. It is an unfair or deceptive act or practice in violation of the Ohio CSPA, O.R.C. 1345.02(A) and 1345.02(B)(8), for a supplier to represent that a specific price advantage exists if it does not.

213. It is an unfair or deceptive act or practice in violation of the Ohio CSPA, O.R.C. 1345.02, and its Substantive Rules, Ohio Adm. Code 109:4-3-03, for a supplier to make an offer of sale of any goods when such offer is not a bona fide effort to sell such goods.

214. As set forth above, Defendant represents, directly or indirectly, expressly or by implication, that Ohio consumers will be charged the advertised price, including in advertisements, circulars, on the company's website and mobile application, on the product itself, on signs affixed near the product, or in shelf prices.

215. Defendant regularly charges Ohio consumers more than the advertised price.

216. Defendant's unfair or deceptive acts or practices have affected and continue to affect the people of the State of Ohio.

217. The Ohio Attorney General is authorized to bring a lawsuit against a supplier to obtain a declaratory judgment, injunctive relief, restitution for consumers, civil penalties up to $25,000 per violation, and other relief. O.R.C. 1345.07.

218. The Ohio Attorney General is authorized to recover a civil penalty if a supplier commits an Ohio CSPA violation that violates a rule previously promulgated pursuant to O.R.C. 1345.05(B)(2) or that violation was committed after a court decision declaring that act a CSPA violation was made available for public inspection pursuant to O.R.C. 1345.05(A)(3).

219. Each instance of an unfair or deceptive act or practice alleged herein constitutes a

separate violation of the Ohio CSPA.

## VIOLATIONS OF OKLAHOMA LAW

## COUNT XV

## (False Representations)

220. The Oklahoma Attorney General incorporates Paragraphs 2 through 10, Paragraph 23, and Paragraphs 29 through 118 as if they were fully alleged herein.

221. Defendant's practices, as set forth above, constitute false representations made in the course of Defendant's business regarding the characteristics, uses, and benefits of the subject consumer transactions; the advertising, knowing or with reason to know, that the subject of the consumer transaction with intent not to sell it as advertised; and false or misleading statements of fact, knowingly or with reason to know, concerning the price of the subject of a consumer transaction that violate the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15, § 753(5), (9) and (12).

222. The consumer goods that Defendant advertised, offered for sale, and sold, as set forth above, are the subject of consumer transactions pursuant to Okla. Stat. tit. 15, § 752(2) because the goods were advertised, offered for sale, and sold for purposes that are personal, household and/or business-oriented.

223. Defendant is a person within the meaning of the Oklahoma Consumer Protection Act pursuant to Okla. Stat. tit. 15, § 752 because it is a corporation, incorporated association, or other legal entity.

224. These false representations by Defendant include representations, directly or indirectly, expressly or by implication, that Family Dollar consumers will be charged the advertised price, including in advertisements, circulars, on the company's website and mobile

application, on the product itself, on signs affixed near the product, or in shelf prices, but the company has routinely charged customers more than these advertised prices.

**COUNT XVI**

**(Unfair Trade Practices)**

225. The Oklahoma Attorney General incorporates Paragraphs 2 through 10, Paragraph 23, and Paragraphs 29 through 118 as if they were fully alleged herein.

226. Defendant's practices, as set forth above, constitute unfair trade practices made in the course of Defendant's business that violate the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15, § 753(21).

227. Defendant's practices, as set forth above, constitute unfair trade practices because such practices offend established public policy or are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, Okla. Stat. tit. 15, § 752(14).

228. Defendant's practices set forth above are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, as consumers were harmed each time they were or are misled into overpaying for the Defendant's goods.

**COUNT XVII**

**(Deceptive Trade Practices)**

229. The Oklahoma Attorney General incorporates Paragraphs 2 through 10, Paragraph 23, and Paragraphs 29 through 118 as if they were fully alleged herein.

230. Defendant's practices, as set forth above, constitute deceptive trade practices made in the course of Defendant's business that violate the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15, § 753(21).

231. Defendant's practices, as set forth above, constitute deceptive trade practices

because Defendant's practices misrepresented, omitted, deceived, or could reasonably be expected to deceive or mislead a person to their detriment into overpaying for the Defendant's goods.

**VIOLATIONS OF PENNSYLVANIA LAW**

**COUNT XVIII**

**Claims and Relief Sought by Pennsylvania Office of Attorney General**

**Pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Act**

**(Deceptive Practices)**

232. The Pennsylvania Office of Attorney General incorporates Paragraphs 2 through 10, Paragraph 24, and Paragraphs 29 through 118 as if they are fully alleged herein.

233. Defendant's practices, as set forth above, constitute deceptive trade practices in the advertising, offering for sale, or sale of goods and services that violate the *Pennsylvania Unfair Trade Practices and Consumer Protection Law*, 73 P.S. § 201-1 *et seq.* ("*PA Consumer Protection Law*").

234. The Pennsylvania Office of Attorney General brings these claims pursuant to the *PA Consumer Protection Law* to restrain unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce declared unlawful by section 201-3 of the *PA Consumer Protection Law*. 73 P.S. § 201-3.

235. The *PA Consumer Protection Law* defines "trade" and "commerce" to mean, "The advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth." 73 P.S. § 201-2(3).

236. Defendant engages in trade and commerce within the Commonwealth of Pennsylvania, as defined by section 201-2(3) of the *PA Consumer Protection Law*, by advertising, offering for sale, and/or selling goods through its operation of over 250 retail stores within the Commonwealth of Pennsylvania. 73 P.S. § 201-2(3).

237. Defendant, in numerous instances in connection with its advertising, offering for sale, and/or selling goods through its operation of over 250 retail stores within the Commonwealth of Pennsylvania, as described above, engages in deceptive trade practices in violation of Section 201-3 of the *PA Consumer Protection Law*, as defined in Section 201-2(4) by:

A. Representing, directly or indirectly, expressly or by implication, that purchasers will be charged an advertised price, including in advertisements, circulars, on its website and mobile application, on the product itself, on signs affixed near the product, or in shelf prices when, in numerous instances, consumers are charged more than the advertised price; and

B. Making false, fictitious, or fraudulent statements or representations to customers of financial instances to obtain or attempt to obtain, or to cause to be disclosed or attempt to cause to be disclosed, customer information of a financial institution, such as bank account numbers, credit card numbers, and debit card numbers, including by representing, directly or indirectly, expressly or by implication, that purchasers will be charged the advertised price, including advertisements, circulars, on the company's website and mobile application, on the product itself, on signs affixed near the product, or in shelf prices.

238. The aforementioned acts and practices have the capacity or tendency to deceive or mislead consumers.

239. Defendant's aforesaid methods, acts or practices constitute deceptive acts or practices in the conduct of trade or commerce by:

A. Advertising goods or services with intent not to sell them as advertised, 73 P.S. §201-2(4)(ix); and

B. Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding, 73 P.S. § 201-2(4)(xxi).

240. The Pennsylvania Office of Attorney General alleges that, at all times relevant hereto, all of the methods, acts and practices described above were performed willfully by Defendant.

241. The Pennsylvania Office of Attorney General believes and therefore avers that consumers in the Commonwealth of Pennsylvania are suffering harm and will continue to suffer harm unless the acts and practices complained of herein are permanently enjoined.

**COUNT XIX**

**(Unfair Practices)**

242. The Pennsylvania Office of Attorney General incorporates Paragraphs 2 through 10, Paragraph 24, and Paragraphs 29 through 118 as if they are fully alleged herein.

243. Defendant, in numerous instances in connection with its advertising, offering for sale, and/or selling goods through its operation of over 250 retail stores within the Commonwealth of Pennsylvania, as described above, engages in unfair trade practices in violation of Section 201-3 of the *PA Consumer Protection Law*, as defined in Section 201-2(4) by:

A. Representing, directly or indirectly, expressly or by implication, that purchasers will be charged an advertised price, including in advertisements, circulars, on its website and mobile application, on the product itself, on signs affixed near the product, or in shelf prices when, in numerous instances, consumers are charged more than the advertised price; and

B. Making false, fictitious, or fraudulent statements or representations to customers of financial instances to obtain or attempt to obtain, or to cause to be disclosed or attempt to cause to be disclosed, customer information of a financial institution, such as bank account numbers, credit card numbers, and debit card numbers, including by representing, directly or indirectly, expressly or by implication, that purchasers will be charged the advertised price, including advertisements, circulars, on the company's website and mobile application, on the product itself, on signs affixed near the product, or in shelf prices.

244. Defendant's aforementioned acts and practices constitute unfair trade practices that violate Section 201-3, as defined by Section 201-2(4) of the *PA Consumer Protection Law*. Specifically, the aforementioned acts and practices: (1) offend public policy; (2) are immoral, unethical, oppressive, or scrupulous; and/or (3) cause substantial injury to advertising customers.

245. Defendant's aforesaid methods, acts or practices constitute unfair acts or practices in the conduct of trade or commerce by:

A. Advertising goods or services with intent not to sell them as advertised, 73 P.S. §201-2(4)(ix); and

B. Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding, 73 P.S. § 201-2(4)(xxi).

246. The Pennsylvania Office of Attorney General alleges that, at all times relevant hereto, all of the methods, acts and practices described above are performed willfully by Defendant.

247. The Pennsylvania Office of Attorney General believes and therefore avers that consumers in the Commonwealth of Pennsylvania are suffering harm and will continue to suffer harm unless the acts and practices complained of herein are permanently enjoined.

**Relief Under the Pennsylvania Unfair Trade Practices and Consumer Protection Act**

248. Defendant should be ordered to cease and desist from unfair methods of competition or unfair or deceptive acts or practices pursuant to Section 201-4 of the *PA Consumer Protection Law*. 73 P.S. § 201-4.

249. Defendant should be ordered to pay restitution to all persons, as that term is defined under Section 201-2(2) of the *PA Consumer Protection Law*, who have suffered losses as a result of the unfair methods of competition or unfair or deceptive acts or practices pursuant to Section 201-4.1 of the *PA Consumer Protection Law*. 73 P.S. § 201-4.1.

250. Defendant should be ordered to pay the costs of this action, including but not limited to attorneys' fees, pursuant to Section 201-4.1 of the *PA Consumer Protection Law*, 73 P.S. § 201-4.1, and Section 1602-U of the Fiscal Code, 72 P.S. § 1602-U.

251. Defendant should be ordered to pay civil penalties in the amount of $1,000.00 for each instance of a willful violation of the *PA Consumer Protection Law*, and $3,000.00 for each instance of a willful violation of the *PA Consumer Protection Law* involving victims age 60

years of age or older pursuant to Section 201-8(b) of the *PA Consumer Protection Law*. 73 P.S. § 201-8(b).

## VIOLATIONS OF SOUTH CAROLINA LAW

## COUNT XX

### Claims and Relief Sought by the State of South Carolina

### Pursuant to the South Carolina Unfair Trade Practices Act

252. Defendant's acts and practices as alleged herein constitute unfair methods of competition and unfair or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10 *et seq*.

253. Defendant's acts and practices as alleged herein are unfair, offensive to established public policy, immoral, and unethical.

254. These acts and practices have resulted in a substantial injury to South Carolina consumers that is not outweighed by any countervailing benefits to consumers or competition.

255. Defendant's acts and practices as alleged herein occurred in the conduct of trade and/or commerce.

256. Defendant's acts and practices as alleged herein are capable of repetition and affect the public interest.

257. By engaging in the acts and practices alleged herein, Defendant made or caused to be made to South Carolina consumers, directly or indirectly, explicitly or by implication, misrepresentations that, reasonably interpreted, are material, false, and have a tendency to deceive.

258. At the time it made or disseminated its false or misleading statements or caused those statements to be made or disseminated, Defendant knew or should have known that the

statements were false or misleading and therefore had a tendency to deceive the public.

259. Every deceptive or unfair act by the Defendant constitutes a separate and distinct violation of S.C. Code § 39-5-20.

260. Defendant's acts and practices as alleged herein are willful under S.C. Code § 39-5-110, subjecting the Defendant to a civil penalty of up to $5,000 per violation of S.C. Code Ann. § 39-5-20.

**VIOLATIONS OF TENNESSEE LAW**

**COUNT XXI**

**Violations of the Tennessee Consumer Protection Act,**

**Tenn. Code Ann. §§ 47-18-101 *et seq.***

261. The Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101 *et seq.* ("TCPA") declares unlawful "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104.

262. The TCPA "shall be interpreted and construed consistently with the interpretations given by the Federal Trade Commission and the federal courts pursuant to § 5(A)(1) of the Federal Trade Commission Act, codified in 15 U.S.C. § 45(a)(1)." Tenn. Code Ann. § 47-18-115.

263. Therefore, Defendant's representations alleged in Count I above, which constitute deceptive acts or practices under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), likewise constitute deceptive acts or practices in violation of Tenn. Code Ann. § 47-18-104.

264. While advertising, marketing, and selling goods in Tennessee, Defendant represented through printed circulars, in-store signage, shelf labels, website listings, digital promotions, and mobile-app "Smart Coupons" that consumers would receive specific advertised

prices for identified products.

265. Despite promoting sale prices, coupon discounts, or multi-item promotions, Defendant repeatedly charged higher prices at checkout than those represented to consumers.

266. Defendant further knew that its point of sale ("POS") pricing system automatically updates register prices before personnel are able to update shelf labels and promotional tags but continued to advertise promotional prices it knew would not be honored at checkout.

267. Additionally, advertised digital coupon price and app-based promotions routinely malfunctioned, digital coupons often failed to load or apply, and the Defendant continued to advertise the digital prices despite the known malfunctions.

268. Defendant's acts, as described above, constitute deceptive acts or practices in violation of Tenn. Code Ann. §§ 47-18-104(a), (b)(9), (11), (21), and (27).

**VIOLATIONS OF UTAH LAW**

269. Section 4(1) of the Utah CSPA, Utah Code § 13-11-4(1), prohibits suppliers from engaging in "deceptive act[s] or practice[s] in connection with a consumer transaction . . . whether the deceptive act occurs before, during, or after the transaction."

270. Under the Utah CSPA, a "supplier" includes "a seller, . . . offeror, . . . or other person who regularly solicits, engages in, or enforces consumer transactions, whether or not the person deals directly with the consumer." *Id.* § 13-11-3(5).

271. The Utah CSPA defines a "consumer transaction" to include "a sale . . . or other written or oral transfer or disposition of goods, services, or other property, both tangible and intangible . . . to, or apparently to, a person for . . . primarily personal, family, or household purposes." *Id.* § 13-11-3(2)(a).

272. As described in this Complaint, Defendant offers and sells goods to consumers for their personal, family, or household use in the State of Utah.

## COUNT XXII

### Deceptive Acts and Practices in Connection with Consumer Transactions

273. By engaging in the practices alleged in Paragraphs 3 through 10 and Paragraphs 29 through 118 of this Complaint, Defendant has committed deceptive acts and practices, including by making or causing (whether directly or indirectly, explicitly or by implication) misrepresentations or omissions of material fact to Utah consumers in connection with their transactions at Family Dollar stores.

274. Specifically, Defendant has repeatedly misrepresented the prices of goods offered for sale in its advertisements, circulars, website, mobile application, product labels, store signage, and shelf prices. Consumers are offered goods for purchase at the advertised price but are often charged more than the advertised price at checkout. Defendant routinely refuses to honor the advertised or listed prices.

275. By engaging in such deceptive acts and practices, Defendant has violated the Utah CSPA and Administrative Rules enacted pursuant thereto. Utah Code § 13-11-4; Utah Admin. Code R152-11-201.

276. Section 17(1)(e) of the Utah CSPA, Utah Code § 13-11-17(1)(e), authorizes this Court to impose fines for violations of the Utah CSPA.

## VIOLATIONS OF WISCONSIN LAW

277. Wisconsin's Deceptive Trade Practices Act, Wis. Stat. § 100.18(1), generally prohibits untrue, deceptive, or misleading representations. Specifically, as related to this action, Wis. Stat. § 100.18(1) provides that no person may, for the purpose of increasing the

consumption of merchandise or services, make, publish, disseminate, circulate, or place before the public, or cause directly or indirectly to be made, published, disseminated, circulated, or placed before the public, any statement or representation that is untrue, deceptive, or misleading.

**COUNT XXIII**

**Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18(1)**

278. By engaging in the practices alleged in Paragraphs 3 through 10 and Paragraphs 29 through 118 of this Complaint, Defendant committed deceptive acts or practices, including by making or causing (whether directly or indirectly, explicitly or by implication) misrepresentations to Wisconsin consumers about the price of the goods sold by Defendant. Each misrepresentation is a separate violation of Wis. Stat. § 100.18(1).

279. By engaging in such deceptive acts and practices, Defendant has violated the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18(1), and Plaintiff State of Wisconsin is entitled to relief including a permanent injunction, restitution, civil forfeitures, consumer protection surcharges, supplemental forfeitures, and attorneys' fees, expenses, and costs. Wis. Stat. §§ 100.18(11)(d), 100.26(4), 100.261, 100.263, and 100.264.

**CONSUMER INJURY**

280. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act, the GLB Act, the Alabama Deceptive Trade Practices Act, the Arkansas Deceptive Trade Practices Act, the Colorado Consumer Protection Act, the Florida Deceptive and Unfair Trade Practices Act, the Illinois Consumer Fraud Act, the Illinois Uniform Deceptive Trade Practices Act, the Iowa Consumer Fraud Act, the Kansas Consumer Protection Act, the Louisiana Unfair Trade Practices and Consumer Protection Law, the Mississippi Consumer Protection Act, the Nebraska Uniform Deceptive

Trade Practices Act, the Ohio Consumer Sales Practices Act, the Oklahoma Consumer Protection Act, the Pennsylvania Unfair Trade Practices and Consumer Protection Law, the South Carolina Unfair Trade Practices Act, the Tennessee Consumer Protection Act, the Utah Consumer Sales Practices Act, and the Wisconsin Deceptive Trade Practices Act. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

**PRAYER FOR RELIEF**

Wherefore, the Plaintiffs request that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act, the GLB Act, the Alabama Deceptive Trade Practices Act, the Arkansas Deceptive Trade Practices Act, the Colorado Consumer Protection Act, the Florida Deceptive and Unfair Trade Practices Act, the Illinois Consumer Fraud Act and the Illinois Uniform Deceptive Trade Practices Act, the Iowa Consumer Fraud Act, the Kansas Consumer Protection Act, the Louisiana Unfair Trade Practices and Consumer Protection Law, the Mississippi Consumer Protection Act, the Nebraska Uniform Deceptive Trade Practices Act, the Ohio Consumer Sales Practices Act, the Oklahoma Consumer Protection Act, the Pennsylvania Unfair Trade Practices and Consumer Protection Law, the South Carolina Unfair Trade Practices Act, the Tennessee Consumer Protection Act, the Utah Consumer Sales Practices Act, and the Wisconsin Deceptive Trade Practices Act;

B. Award monetary and other relief within the Court's power to grant;

C. Award Plaintiff States civil fines, restitution, disgorgement, forfeitures, or penalties for each violation of their respective state laws, attorneys' fees, and expenses as provided under state law; and

D. Award Plaintiffs the costs of bringing this action, attorneys' fees, and such other and additional relief as the Court may determine to be just and proper.

Dated: November 12, 2026

Respectfully submitted,

/s/ Maris K.V. Snell

CHRISTOPHER G. MUFARRIGE
Director, Bureau of Consumer Protection

ANNIE CHIANG
Deputy Director, Bureau of Consumer Protection

Christopher J. Erickson
Baasil Shariff
Evan M. Mendelson
Federal Trade Commission
600 Pennsylvania Avenue, NW, CC-6316
Washington, DC 20580
Phones: 202-677-8302 (Erickson); 202-326-2855 (Shariff); 202-326-3320 (Mendelson)
Emails: cerickson@ftc.gov; bshariff@ftc.gov; emendelson@ftc.gov

Maris K.V. Snell
Federal Trade Commission
1350 Euclid Avenue, Suite 325
Cleveland, OH 44115
Phone: 202-660-8544
Email: msnell@ftc.gov

Abbey Thornhill Wallace (VA Bar No. 96004)
Local Counsel
Federal Trade Commission
600 Pennsylvania Avenue, NW, CC-6316
Washington, DC 20580
Phone: 202-256-1507
Email: awallace@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

**FOR THE STATE OF ALABAMA:**

Steve Marshall
Attorney General

By: /s/ Michael G. Dean
Michael G. Dean (*pro hac vice forthcoming*)
Assistant Attorney General
Office of the Attorney General
Consumer Interest Division
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
(334) 353-0415
Michael.Dean@AlabamaAG.gov

Attorney for Plaintiff the State of Alabama

**FOR THE STATE OF ARKANSAS:**

TIM GRIFFIN
ATTORNEY GENERAL

By: /s/ Amanda Wentz
Amanda Wentz, Ark. Bar No. 2021066
(*pro hac vice forthcoming)*
Senior Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, AR 72201
Phone: (501) 682-1178
Fax: (501) 682-8118
Email: amanda.wentz@arkansasag.gov

Attorney for Plaintiff the State of Arkansas

**FOR THE COLORADO ATTORNEY GENERAL:**

/s/ Kolya Glick
Kolya D. Glick (Va. Bar No. 89196)
Senior Assistant Attorney General
Lauren M. Dickey
First Assistant Attorney General
Conor A. Kruger
Senior Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Emails: kolya.glick@coag.gov
lauren.dickey@coag.gov
conor.kruger@coag.gov

Attorneys for Plaintiff, the Colorado Attorney General

**FOR THE OFFICE OF THE ATTORNEY GENERAL STATE OF FLORIDA:**

JAMES UTHMEIER
*Attorney General*

*/s/ Ryan M. Uhrig*
Ryan Michael Uhrig (FBN 118468)
(*pro hac vice forthcoming*)
*Special Counsel*
Victoria Ann Butler (FBN 861250)
*Director of Consumer Protection*

Florida Office of the Attorney General
3507 E. Frontage Road, Suite 325
Tampa, Florida 33607
Telephone (813) 287-7260

Attorneys for Plaintiff, the Office of the Attorney General, State of Florida, Department of Legal Affairs

**FOR THE PEOPLE OF THE STATE OF ILLINOIS:**

KWAME RAOUL
Attorney General

/s/ Linda Jun
LINDA JUN, pro hac vice forthcoming
JACOB GILBERT, pro hac vice forthcoming
Office of the Illinois Attorney General
Consumer Fraud Bureau
115 S. LaSalle Street, 26th Floor
Chicago, IL 60603
(312)814-3000
Linda.Jun@ilag.gov
Jacob.Gilbert@ilag.gov

Attorneys for Plaintiff
The People of the State of Illinois

**FOR THE STATE OF IOWA:**

BRENNA BIRD
Attorney General of Iowa

/s/ Eric Wessan
Eric Wessan (*pro hac vice forthcoming*)
Solicitor General
Hoover State Office Bldg.
1305 E. Walnut St.
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

Attorney for Plaintiff the State of Iowa

**FOR THE STATE OF KANSAS:**

KRIS W. KOBACH
ATTORNEY GENERAL

BY: /s/ Kaley Schrader
Kaley Schrader, KS Bar No. 27700
(*pro hac vice forthcoming*)
Assistant Attorney General
Office of the Kansas Attorney General
120 SW 10th Ave, 2nd Floor
Topeka, Kansas 66612-1597
Telephone: (785) 296-3751
Fax: (785) 291-3699
Email: kaley.schrader@ag.ks.gov

Attorney for Plaintiff the State of Kansas

**FOR THE STATE OF LOUISIANA:**

LIZ MURRILL
ATTORNEY GENERAL

BY: /s/ Hanna W. Thomas
Hanna W. Thomas, La. Bar No. 32082
(*pro hac vice forthcoming*)
Assistant Attorney General Specialist
Louisiana Department of Justice
Public Protection Division
1885 North 3rd Street (70802)
Post Office Box 94005
Baton Rouge, Louisiana 70804-9005
Telephone: (225) 326-6438
Facsimile: (225) 326-6499
Email: ThomasH@ag.louisiana.gov

Attorney for Plaintiff the State of Louisiana

**FOR THE STATE OF MISSISSIPPI:**

LYNN FITCH
ATTORNEY GENERAL

By: /s/ Sandra D. Buchanan
Sandra D. Buchanan, MSB# 100864
(*pro hac vice forthcoming*)
Consumer Protection Division
Mississippi Attorney General's Office
Post Office Box 220
Jackson, Mississippi 39205
Phone: 601-359-4223
Emails: sandra.buchanan@ago.ms.gov;

Attorney for Plaintiff the State of Mississippi

**FOR THE STATE OF NEBRASKA:**

MICHAEL T. HILGERS
Attorney General of Nebraska

/s/ Michael A. Greenlee
Michael A. Greenlee (NE #24333)
(*pro hac vice forthcoming*)
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68508
Telephone: (402) 471-3840
Fax: (402) 471-4725
michael.greenlee@nebraska.gov

Attorney for Plaintiff the State of Nebraska

**FOR THE STATE OF OHIO:**

D. ANDREW WILSON
Attorney General
State of Ohio

/s/ Andrew D. Neuhauser
Andrew D. Neuhauser (Ohio Bar No. 0082799)
(*pro hac vice forthcoming*)
Paige E. Weinstein (Ohio Bar No. 0098371)
(*pro hac vice forthcoming*)
Assistant Attorneys General
Consumer Protection Section
Ohio Attorney General's Office
30 East Broad Street
Columbus, Ohio 43215
Telephone: 614-644-9618
Facsimile: 866-921-9921
Andrew.Neuhauser@OhioAGO.gov
Paige.Weinstein@OhioAGO.gov

Attorneys for Plaintiff the State of Ohio *ex rel.* Attorney General D. Andrew Wilson

**FOR THE STATE OF OKLAHOMA:**

GENTNER DRUMMOND
OKLAHOMA ATTORNEY GENERAL

/s/ *Kristin Siegel*
Cameron R. Capps (*pro hac vice forthcoming*)
Deputy Attorney General
Kristin Siegel (*pro hac vice forthcoming*)
Assistant Attorney General
313 NE 21st Street
Oklahoma City, Oklahoma 73105
Telephone: (405) 522-9052
Facsimile: (405) 521-3921
Email: Cameron.Capps@oag.ok.gov
Kristin.Siegel@oag.ok.gov

Attorneys for Plaintiff the State of Oklahoma

**FOR THE COMMONWEALTH OF PENNSYLVANIA:**

DAVID W. SUNDAY, JR.
Attorney General for the Commonwealth of Pennsylvania

/s/ Jaimie L. George
Jaimie L. George PA Id. No. 309368
(*pro hac vice forthcoming*)
Deputy Attorney General
Pennsylvania Office of Attorney General
1251 Waterfront Place, Mezzanine Level
Pittsburgh, PA 15222
Telephone: (412) 565-7680
Email: jgeorge@attorneygeneral.gov
Fax: (412) 565-3019

Attorney for Plaintiff the Commonwealth of Pennsylvania

**FOR THE STATE OF SOUTH CAROLINA:**

ALAN WILSON
Attorney General

/s/ Jared Q. Libet
Jared Q. Libet (*pro hac vice forthcoming*)
Assistant Deputy Attorney General
Jordan Martin (*pro hac vice forthcoming*)
Assistant Attorney General
Office of the South Carolina Attorney General
Consumer Protection & Antitrust Division
Telephone: (803) 734-5251
Email: jlibet@scag.gov
Email: jordanmartin@scag.gov

Attorneys for Plaintiff State of South Carolina

**FOR THE STATE OF TENNESSEE:**

JONATHAN SKRMETTI
Attorney General and Reporter

/s/ Hannah G. Murray
Hannah G. Murray (*pro hac vice forthcoming*)
Daimon S. Duggar (*pro hac vice forthcoming*)
Office of the Tennessee Attorney General
Public Protection Section
Consumer Protection Division
P.O. Box 20207
Nashville, TN 37202-0207
Phones: 615-253-4146 (Murray);
615-253-5830 (Duggar)
Emails: Hannah.Murray@ag.tn.gov;
Daimon.Duggar@ag.tn.gov

Attorneys for Plaintiff the State of Tennessee

**FOR THE UTAH DIVISION OF CONSUMER PROTECTION:**

/s/ Alexandra Butler
DEREK E. BROWN
UTAH ATTORNEY GENERAL
Douglas Crapo
Public Protection Deputy Attorney General
Alexandra Butler (*pro hac vice forthcoming*)
Assistant Attorney General
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0310
alexandrabutler@agutah.gov

Attorneys for Plaintiff Utah Division of Consumer Protection

**FOR THE STATE OF WISCONSIN:**

JOSHUA L. KAUL
Attorney General of Wisconsin

/s/ Laura E. McFarlane
LAURA E. MCFARLANE
Assistant Attorney General
State Bar #1089358 (*pro hac vice forthcoming*)
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-8911
(608) 294-2907 (Fax)
laura.mcfarlane@wisdoj.gov

Attorney for the State of Wisconsin